Justin P. HAVEE, as Trustee for William Henry Belk, Jr., a/k/a William Henry Belk, and Union Bank of Bavaria, Plaintiffs,

v.

Irwin BELK and Sarah Belk Gambrell, Defendants.

No. C–C–83–0183–M.

United States District Court, W.D. North Carolina, Charlotte Division.

June 25, 1984.

Barbara L. Phillips, Phillips & Phillips, P.A., Miami, Fla., Edgar Love, III, Kennedy, Covington, Lobdell & Hickman, Charlotte, N.C., and James F. Gleason, Jr., Hertzog, Calamari & Gleason, New York City, for plaintiffs.

John Allred and Robert D. Dearborn, Moore, Van Allen & Allen, Charlotte, N.C., and Larry D. Estridge, Wyche, Burgess, Freeman & Parham, Greenville, S.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

### FINDINGS OF FACT

## I. BACKGROUND INFORMATION

William Henry Belk, Sr. went into the retail drygoods business in the late 1880's. Starting with one store in Monroe, Union County, North Carolina, he added various other "Belk" stores, under varying ownerships, and at the time of his death in the early 1950's there were several hundred "Belk" stores scattered throughout the southeast. The business begun by William Henry Belk, Sr., has continued to thrive through the present day.

Most Belk stores have one or more substantial local shareholders who are referred to as "partners." Some "partners" own substantial amounts of stock in more than one store. The stores and groups of stores are known as "Belk's," or "Belk-Tyler," or "Belk-Hensdale," or "Belk-Leggett," or "Belk-Gallant," or "Hudson-Belk," and so on. Each store is a separate entity and many stores are separate corporations. Some "partners" own stock in two or a dozen or more stores. There is no single corporate structure for the Belk "chain"; at the present time there are more than three hundred stores in seventeen states, and the number of corporations owning those stores is about two hundred. There is no management and no ownership common to all the stores.

The Belk Buying Service in one period performed purchasing services for various stores. Those services are now performed by Belk Stores Services. Belk Stores Services does not *manage* the stores. However, for those stores which request it, Belk Stores Services provides, on essentially a cost basis, services in the form of purchasing, insurance information, merchandising advice, real estate, advertising, and other services.

William Henry Belk, Sr. left six children: William Henry Belk, Jr., Sarah Belk Gambrell, Irwin Belk, John Belk, Henderson Belk and Tom Belk. Those children inherited his stock in the various Belk corporations.

The six Belk children, thirty years after the death of their father, owned the great majority of the stock in an investment company, Belk Enterprises, Inc., and large portions of the stock in the two hundred or so corporations which owned the more than three hundred separate department stores throughout the southeastern part of the United States.

The stock in the various Belk stores and in Belk Enterprises, Inc. is closely held; most of the stock in the various corporations is owned by the Belk brothers and sister and their "partners," and a relatively few colleagues, associates, employees, family and friends. None of the stock is listed on any stock exchange and nobody maintains a market or regularly quotes prices for it. It is not "freely traded."

## II. THE TRANSACTIONS COMPLAINED OF.

On March 1, 1982, William Henry Belk, Jr. ("Henry"), filed a voluntary petition in bankruptcy in the United States Court for the Southern District of Florida. Claims against his estate were filed in an amount of about eight and one-half million dollars, and his assets, at that time, were a minor fraction of his liabilities.

Many years previously, Henry Belk, Jr., had become an investor in a number of department stores in Florida, Alabama and points south and west. His chief co-adventurer in those stores was Richard Avery, and the stores are referred to as "Avery's" or "Avery's, Inc." or "William Henry's."

By late March, 1980, Avery's, Inc. had borrowed considerable sums, and Henry Belk had signed papers with Citibank of New York and Maryland National Leasing Corp., guaranteeing debts of Avery's, Inc. in amounts apparently totaling several million dollars.

To secure the borrowings by Avery's, Inc., Henry Belk had pledged and assigned to Citibank of New York and Maryland National Leasing Corp. as collateral a num-

602

ber of shares of stock in forty-seven different Belk corporations, including Belk Enterprises, Inc. (List "A," attached).

The Avery's, Inc. loans came due and Avery's, Inc. did not have the money to pay.

Avery's, Inc. and Henry Belk sought help from other sources, including Belks. A meeting was held in Charlotte among various people, including Henderson Belk, Henry Belk, Larry Estridge, attorney for Sarah Belk Gambrell, Richard Avery, Irwin Belk, Sarah Belk Gambrell, Leroy Robinson, attorney for Belk Enterprises, Inc., David M. McConnell, attorney, Theresa Duncan, bookkeeper for Avery's, Inc., and perhaps others.

An agreement was made at that meeting that Irwin Belk and Sarah Belk Gambrell would buy from Citibank of New York, for the sum of $3,367,000.00, the shares of stock which had been pledged to and assigned to Citibank and Maryland National Leasing Corp. by Henry Belk as collateral for the loans to Avery's, Inc. A condition of the agreement was that Henry Belk would have the option to repurchase the stock at any time within twelve months, for the purchase price plus 25%. (Since the prime rate at the time was just a shade under 20% and rising, this was the approximate financial equivalent of the amount Irwin Belk and Sarah Belk Gambrell paid for the stock, plus a year's interest on the purchase price, plus expenses.)

The 47 stocks listed on List "A" as "Citibank/Maryland National" were transferred to Irwin Belk and Sarah Belk Gambrell on April 8, 1980, nearly *two years* before Henry Belk filed for bankruptcy on March 1, 1982. The other 109 stocks on List "A" were transferred on various dates between April 25, 1980, and June 22, 1980.

Several years before these transactions (apparently in 1976), and independent of them, Sarah Belk Gambrell had obtained an agreement with Henry Belk which gave her the right, until 1985, of first refusal of any stock in one of the corporations, Belk Enterprises, Inc. which Henry Belk might offer for sale.

In June of 1981, Sarah Belk Gambrell and Irwin Belk purchased from Henry Belk shares of stock in forty-five other "Belk" corporations for total consideration of $1,587,522.00. One of those corporations was Belk Brothers, Inc., of Charlotte, which apparently operates the Charlotte group of department stores, and the other forty-four are corporations operating stores in North Carolina, South Carolina, Alabama, Virginia, Kentucky, Florida, Mississippi, Tennessee, Georgia and Arkansas.

On March 23, 1983, these two suits were filed against Irwin Belk and Sarah Belk Gambrell and various other defendants by plaintiffs, Union Bank of Bavaria (as creditor) and Justin P. Havee, Trustee in Bankruptcy for Henry Belk. The suits seek, on various state and federal law theories, to have set aside as fraudulent conveyances the transfers of stock described above. The cases were consolidated for preparation and trial. On May 21, 1984, the day the trial began, Case # C–C–83–0184–M was, by consent, dismissed with prejudice. Upon motion of plaintiffs, the remaining case, # C–C–83–0183–M, was tried to a jury.

The essence of the complaints was that the prices paid by Irwin Belk and Sarah Belk Gambrell for the stocks in question were considerably lower than the alleged actual values of the stocks, and that the transfers were effected for the purpose of shielding the assets of William Henry Belk, Jr., from his creditors and at times when, to the knowledge of defendants, William Henry Belk, Jr., was insolvent or about to become insolvent and unable to meet his obligations. Plaintiffs drew attention especially to the fact that some of the prices paid by defendants for some of the Belk stocks were lower than the "book value" of those stocks.

III. THE VERDICT

The case was tried for two weeks, from May 21, 1984, through June 1, 1984. It resulted in a verdict in favor of each de-

fendant on issues (identical as to both defendants) answered as follows:

1. Did William Henry Belk, Jr. transfer shares of stock to defendant [Irwin Belk] [Sarah Belk Gambrell] between April 8, 1980, and June 22, 1981, for less than a reasonably fair price?

ANSWER: No

2. Did William Henry Belk, Jr. transfer shares of stock to defendant [Irwin Belk] [Sarah Belk Gambrell] between April 8, 1980, and June 22, 1981, without retaining property fully sufficient and available to meet his then-existing obligations?

ANSWER: _____

3. Did William Henry Belk, Jr. transfer shares of stock to defendant [Irwin Belk] [Sarah Belk Gambrell] between April 8, 1980, and June 22, 1981, with the purpose or intent to delay, hinder or defraud his creditors?

ANSWER: No

4. If you have answered "Yes" to number 3, did defendant [Irwin Belk] [Sarah Belk Gambrell] have notice of or participate in William Henry Belk, Jr.'s purpose or intent to delay, hinder or defraud his creditors?

ANSWER: _____

5. Did William Henry Belk, Jr. transfer shares of stock to defendant [Irwin Belk] [Sarah Belk Gambrell] between June 5, 1981, and June 22, 1981, with the actual intent to hinder, delay or defraud his creditors?

ANSWER: No

6. Did William Henry Belk, Jr. transfer shares of stock between June 5, 1981, and June 22, 1981, to defendant [Irwin Belk] [Sarah Belk Gambrell] for less than a reasonably equivalent value, while he was insolvent or which resulted in his insolvency?

ANSWER: No

7. (Answer only if the answer to either issue number 5 or issue number 6 is "Yes.") With respect to purchases by [Irwin Belk] [Sarah Belk Gambrell] after March 1, 1981, did [Irwin Belk] [Sarah Belk Gambrell] purchase such stock in good faith?

ANSWER: _____

The stock lists [ (A), 17 pages, and (B), 5 pages], and two pages [ (c) and (d) ] of written instructions to the jury (which are a "road map" through the issues), are attached separately and incorporated in and made a part of these findings and conclusions.

The issues were submitted to the jury in this form and order so that the state law claims could be decided by the answers to issues 1 through 4, and the federal law claims could be decided by the answers to issues 5 through 7.

The court expressly agrees with the jury verdict and adopts and finds as facts and concludes as matters of law exactly what the jury found and concluded in its answers to the issues.

The verdict is overwhelmingly supported by the greater weight of the evidence.

If the jury had answered the issues in favor of the plaintiffs the court (who in hundreds of jury trials has set aside only three or four verdicts) would not have been inclined to allow such a verdict to stand.

IV. FINDINGS BY THE COURT

■ A. *The prices paid by defendants for the stocks in question were "reasonably fair" prices (North Carolina standard) and were "reasonably equivalent values" (federal standard).*

Plaintiffs' principal witness on the question of value was Morton Mark Lee, an employee of Standard Research Consultants. He went through a process of picking out five *publicly held* and *freely traded* corporations which he treated as "comparable" with Belk corporations, and produced some data as to the sales prices for

stock in those corporations during pertinent periods. From this process he prepared a document, Exhibit 2010, which was his list of "freely traded" values for stock in various "Belk" corporations.

He testified he had not adjusted his estimate for the factor of "control," nor for the factor of discount for lack of marketability because the stocks were not freely traded.

On cross-examination, Lee testified (a) that he was not rendering an opinion as to fair market or "reasonable" value; (b) that he had not been supplied by plaintiffs' counsel with data on all the companies involved; (c) that he had never been *asked* to give an opinion on fair market value of the stock; (d) that no reputable firm would give such opinions without financial analysis of each company; (e) that none of the Belk stocks were freely traded and that his premise of "freely traded value" was not based upon fact; (f) that if asked in court for the fair market value of the stocks, he would say he had no opinion on the subject; and (g) that he has done no investigation to determine whether there was in fact a market for the Belk stock. His opinions thus were, at best, opinions as to what the value of the Belk stocks *"would be" if* the facts were different from what they are!

Lee's testimony also demonstrated that the chains he called "comparable" were not really comparable in significant ways. Some operate free standing shoe stores, card shops, cafeterias and car care centers; Belk Stores have all departments in one location. One of the companies has more than three times the volume of any group of Belk stores. Ivey's, perhaps the closest comparable in nature of business and in location, was selling in January of 1980 at only 56% of book value, which was a lower percentage of book value than defendants paid in 1980 and 1981 for the stock in the Belk companies!

The plaintiffs' other witness on stock values, Mr. Gibbore, testified from fragmentary and incomplete data. He confessed that he left out various items of pertinent information at the request of counsel for the plaintiffs, and that this departure from normal accounting procedure had resulted in a biased picture. Mr. Gibbore's testimony was not of any help to the court.

There was testimony that in a bidding war among the Belks some stock in the Belk-Tyler group of stores sold for 175% of book value. There was also testimony (Exhibit 2020) that on September 16, 1980, Irwin Belk and Sarah Belk Gambrell bought from Henry Belk a number of shares of stock in one of the Belk corporations at a price of *136%* of book value. An examination of Plaintiffs' Exhibit 2020 confirms the view that any relationship between book value and prices paid by Irwin Belk and Sarah Belk Gambrell for stock in Belk companies is accidental; that exhibit, covering most of the transfers from March 1980 to June of 1981, shows that the relationship of price to book value ranged from 42% to 146% with the numerical average of the prices being apparently 57% of book value.

The defendants' witness, Dr. Robert Avenger, an expert in stock values, testified credibly that the fair value of a closely held stock is what you can sell it for in an actual transaction; that the transaction itself establishes the value on that day; that in a closely held company there may at times be no market at all; that the number of potential buyers is a very important factor; that comparisons of value between closely held stock on the one hand and freely traded stock on the other hand can not meaningfully be made. He testified that book value is of little help in determining market value; that he had studied other transactions in stock in Belk companies and could see no pattern or trend in the relationship of selling price to book value.

Avenger commented on plaintiffs' contention that stock in Belk corporations should be compared with stock in companies like Ivey's, Woodward & Lothrop, and Jacobson's. He pointed out that stock in these "comparables" was freely traded rather than closely held; that in 1980, for example, the price of these "comparables" varied from 28% to 76% of book value, and

that in 1981 the highest prices for stock in these comparable corporations averaged 69% of the book value and the lowest prices averaged 47% of book value.

Dr. Avenger testified that if he were to go through the artificial exercise of comparing the closely held Belk stock with the freely traded stock in Ivey's and the other four "comparables," the Belk stock should be discounted 35% for lack of liquidity, and that a fair price would not have exceeded 45% of book value. He pointed out that the prices actually paid by defendants for the Henry Belk stock in 1980 averaged about 65% of book value, and in 1981 averaged about 53% of book value, so that defendants had, in fact, paid substantially more than plaintiffs' "comparables" theory would produce. It was the opinion of this witness that the prices paid for the stock in question were at least reasonably fair prices and at least reasonably equivalent value.

As pointed out elsewhere, Plaintiffs' Exhibit 2020 shows that for the stocks it lists as purchased between March of 1980 and June 22, 1981, the average of the prices was 57% of book value and the *range* of prices was from 42% to 146% of book value. The Belk witnesses who testified on the subject said that book value was not a factor in determining prices.

I find as a fact from all the evidence, and taking due note of the incompleteness and selective nature of the data relied on by the plaintiffs, and the other essential facts, that there was "fair and reasonable value" or, otherwise stated, a "reasonably equivalent value" paid by defendants for all the stocks involved in this controversy.

■ B. *No transfers were made by Henry Belk with the intent to defeat, delay or defraud creditors, and the transferees, Sarah Belk Gambrell and Irwin Belk, had no knowledge nor notice of any such intent.*

No one testified there was any such intent on Henry Belk's part or any such knowledge or notice on the part of the transferees.

Sarah Belk Gambrell and Irwin Belk and Henry Belk all testified there was no such intent.

The court finds specifically that there was no such intent on Henry Belk's part and no such knowledge or notice of such intent on the part of Irwin Belk or Sarah Belk Gambrell.

Since the transfers of this closely held stock were not "voluntary" but were for reasonably fair prices, and for reasonably equivalent value, the court sees no "badge of fraud" from which such intent should be inferred.

As to the "family relationship" as a fact raising an inference of fraud: This record does not show nor even suggest that any Belk wields or has wielded undue influence over another. It shows that defendants bought some of their brother's stock to help him save his investment in a threatened department store chain. The jury drew no conclusion of fraud from these events. Neither does the court.

■ C. *Plaintiffs have failed to prove which transfers of stock, if any, were made while Henry Belk (as distinguished from Avery's, Inc.) was insolvent, or which transfers, if any, caused him to become insolvent, or which transfers, if any, left Henry Belk without sufficient means to meet his obligations.*

In an effort to prove these propositions, plaintiffs called upon a well respected Charlotte accountant, Robert G. Sanford. Mr. Sanford testified that he had been retained a short time before the trial to examine certain data and give testimony as to the financial condition of William Henry Belk on several dates between April 8, 1980, and June 22, 1981. The gist of his testimony was that based upon the information made available to him by counsel for the plaintiffs, it was his opinion that Henry Belk's liabilities exceeded his assets on a number of dates in 1980 and 1981.

Because of a number of things frankly disclosed by Mr. Sanford on direct and cross-examination, the court is of the opinion that the witness's conclusions or opin-

ions should not be accepted and that the plaintiffs have not carried their burden of proving their case in these particulars.

Mr. Sanford was working from incomplete data, several years old.

All of that data was second and third hand.

No actual balance sheets of Henry Belk as of the pertinent times were produced.

Some of Henry Belk's personal records had been turned over to the bankruptcy court in Florida, and his trustee, the plaintiff Havee, did not bring them into court.

The incomplete records which plaintiffs' counsel turned over to Mr. Sanford were not complete enough, according to Sanford, to make an audit. As to Henry Belk's records, only a "substantial" part were original. (The witness defined "substantial" as meaning perhaps 20% or 30% or 40% or perhaps 50%!) None of the records had been audited. Mr. Sanford, looking backward two to four years into a two-year period preceding Henry Belk's bankruptcy, evaluated Belk's various assets at the values actually realized by the bankruptcy proceedings, as opposed to values which might reasonably have been attributed to them in those earlier years while Avery's and Belks' were both going concerns. He disregarded the value of all the other guarantees (such as those of Richard Avery) of the loans which Belk had guaranteed. He disregarded the only recorded contemporary opinion in the history of the case as to the net worth of Belk's co-guarantor Richard Avery (the opinion of Union Bank of Bavaria in mid-1979 that Richard Avery had a net worth of more than $2,000,000 based upon an *audited* statement of Avery). He gave zero values, without investigation, to all the other guaranties (such as those of Dellinger and Higgins) which backed up Belk's guaranties. He did not consider the 1980 and 1981 values of leases on various items of collateral. He based his 1984 trial date opinion on what the collector had ultimately realized in the foreclosure and bankruptcy. Upon instructions from counsel for plaintiffs he excluded the value of Belk's interest in his pension plan

and in certain family trusts. He did not attach any value whatever to 1980 accounts receivable. He attached no value to certain items of equipment. He listed Avery's debts as debts of Henry Belk. He did not include any rights of Belk to recoup from third parties. In his parallel treatment of financial condition of Avery's, Inc. and Henry Belk, he treated Belk's claim against Avery's as a debt of Avery but gave it no value as an account receivable by Belk. He had worked under pressure to produce even the fragmentary and limited information he had produced. He conceded that he had not followed standard accounting practices because he had not become acquainted with (1) the business; (2) its records; (3) the qualifications of its principal personnel; (4) the basis of its accounts; and (5) its experience.

With all due respect to a first-class and honest accountant and long-time friend, I do not see how Mr. Sanford's testimony can support a finding as to the financial condition of Mr. Belk or of the corporation, Avery's, Inc., at the times pertinent to the issues in this case.

The defendants did show a number of things which bear upon the issue of Belk's financial condition. They were:

(1) That Henry Belk's financial troubles came from his guaranties of the obligations of the Avery corporations;

(2) That Richard Avery was the principal operating force in the Avery group;

(3) That Henry Belk was looking everywhere for credit to support the Avery corporations and had his attorney also working on that problem; that he expressed to several people his confidence that the necessary credit would be obtained which would enable the Avery corporations to meet their obligations;

(4) That Union Bank of Bavaria, one of the plaintiffs, had in fact agreed to lend money to Avery's but had not delivered a substantial portion of the loan; and

(5) That the high interest rates of 1980–81 (as much as 20% to 21% prime

rate) put a heavy squeeze on the supply of credit.

Plaintiffs did not bring as witnesses anybody who prepared the original records for Belk or Avery's, Inc.

They did not bring any accountants who audited those original records or prepared financial statements for Belk or Avery's, Inc.

They did not bring the second set of accountants who had prepared further information based upon the records that had been generated locally.

They did not bring the auditor who is supposed, according to the testimony, to have made some type of work sheets or summaries from which Mr. Sanford did much of his work.

It *may* well be that at some of the times pertinent to some of the transfers Henry Belk was insolvent or that he was without sufficient means to meet his obligations. The trouble is that the evidence offered in support of that proposition has proved to be fragmentary and incomplete and it contains serious and unjustifiable omissions and exclusions; it was based on second-hand and third-hand data; and the opinions rendered in court were not in accordance with standard accounting procedures.

Therefore (although this finding may not be necessary), I find that plaintiffs have not carried their burden of proving that Henry Belk was insolvent or unable to meet his obligations at times pertinent to the challenged transfers, or that he was rendered so by the transfers.

*    *    *    *    *    *

■ The plaintiff Havee, a bankruptcy trustee, brought this suit under the authority of 11 U.S.C. § 544, which expressly incorporates state law. The plaintiff Union Bank of Bavaria, a creditor, brought its action under North Carolina law and this court's diversity jurisdiction. North Carolina law provides that the question of the grantor's indebtedness in a case alleging fraudulent conveyance shall be submitted to a jury. N.C.Gen.Stat. § 39–17. Plaintiffs in this case seek no damages, but seek only equitable relief; if only federal law were involved plaintiff would not be entitled to a jury. Moreover, as a general proposition, state laws cannot "alter the essential character or function of a federal court." *Herron v. Southern Pacific Co.,* 283 U.S. 91, 94, 51 S.Ct. 383, 384, 75 L.Ed. 857 (1931).

The *state law* issues were, of course, properly submitted to the jury because (1) right to jury trial is an essential and historic feature of North Carolina statutory and case law in cases alleging fraudulent conveyance; because (2) application of the state policy in this case did not disrupt the special "judge and jury" relationship of the federal court; and because (3) both fact-finders have reached the same factual conclusions from the same evidence. *See Byrd v. Blue Ridge Cooperative,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and the discussion in Wright & Miller, *Federal Practice and Procedure,* § 2303 (1971).

■ Although it is the defendant rather than the plaintiff who is entitled under North Carolina law to demand jury trial, in this case defendants did not object to the plaintiffs' request for a jury trial but, by silence and action, acquiesced in it; and it would seem inappropriate for plaintiffs now to be able to challenge the authority of the tribunal (the twelve-person jury) which they themselves selected to try the case.

In light of the foregoing, the court is of the opinion that separate findings of fact and conclusions of law by the court are not required. Nevertheless, upon the premise that this court's reading of the law and procedure is, as in other matters, subject to error, I have made these findings of fact and conclusions of law in accordance with the Federal Rules of Civil Procedure.

CONCLUSIONS OF LAW

The challenged sales of stock were not made for less than a reasonably fair price. The challenged sales of stock did not leave the transferor, William Henry Belk, Jr., without property fully sufficient and available to meet his then existing obligations.

608

The transfers were not made for less than a reasonably equivalent value and they did not result in his insolvency. None of the transfers were made with the purpose or intent to delay, hinder or defraud creditors. Neither of the defendants had notice of nor participated in any action, purpose or intent to delay, hinder or defraud creditors.

None of the conveyances in question in this case were fraudulent within the meaning of any of the pertinent North Carolina or federal statutes.