DONALD RUSSELL, Circuit Judge:
Initially two actions were instituted on the same day seeking to void as fraudulent conveyances a large number of transfers of corporate stock of the bankrupt William Henry Belk, Jr. (Henry Belk). The plaintiff in one action was the Union Bank of Bavaria (Bank), suing as a judgment creditor of the bankrupt and as the assignee of all the “powers [of the trustees of the bankrupt] under Sections 544, 548 and 550 of the Bankruptcy Code” by authorization of the “United States District Court for the Northern District of Florida, Bankruptcy Division.” The plaintiff in the other action was the Trustee in bankruptcy of Henry Belk under appointment in the bankruptcy proceedings. Federal jurisdiction was predicated on diversity of citizenship.[1]
The complaints in the two actions framed largely similar issues and invoked both the Fraudulent Conveyance Act of North Carolina[2] and sections 544(b) and 548 of the *1212 Bankruptcy Code (11 U.S.C.) as the legal basis for their claims for relief. The allegations in the Trustee’s complaint were, however, much broader in scope and included more defendants than the complaint of the Bank in its action. In his action, the Trustee named seventeen different transferees of the challenged transfers and identified some 176 allegedly fraudulent conveyances, made during 1980 and 1981. These conveyances consisted of corporate stock in various separate, closely-held “Belk” corporations. All these transferees, including the defendants Irwin Belk and Sarah Belk Gambrell, were named defendants in the Trustee’s action. The Bank in its complaint, on the other hand, specified as fraudulent conveyances only certain transfers of stock made in 1980 to the defendants Irwin Belk and Sarah Belk Gambrell and accordingly named those two as the defendants in its action. Before trial, however, the Trustee agreed to the dismissal in his action of all defendants other than Irwin Belk and Sarah Belk Gambrell. Moreover, both plaintiffs abandoned before trial their challenges to a great number of the transfers, including some made to the defendants, Irwin Belk and Sarah Belk Gambrell. As a result of these dismissals and abandonments, the adjusted book value of the stock, the transfer of which was asserted to be in violation of both the North Carolina state law and the Bankruptcy Code, was reduced from $13,-539,115.69 to an adjusted book value of $7,053,285. Thus, in the course of the proceedings, the number of defendants in the consolidated actions was reduced from seventeen to two and the plaintiffs lowered the alleged adjusted value of the stock transferred by about a half.[3]
The transactions in issue, as the cause was submitted to the jury, consisted of parts of two groups of stock transfers.[4] The first group covered transfers of stock pledged to Citicorp, Maryland National Leasing Corp., Farmers Bank, First Security Bank, and American National Bank, which transfers were made in April, May and July, 1980. The second group consisted of transfers of unencumbered stock and of stock pledged to Integon Insurance Company, which were made in June, 1981, about nine months before the bankruptcy petition was filed by Henry Belk. These transfers were, of course, covered by section 548 of the Bankruptcy Code. Since both actions—that of the Bank and that of the Trustee—asserted claims under the North Carolina Fraudulent Conveyance Statute and under section 548 of the Bankruptcy Code and involved challenges to many of the transfers to the defendants, the district judge in the interest of efficient disposition of the causes early consolidated the actions for discovery and trial after the *1213 plaintiffs had separately suggested that such consolidation might well be in order.[5]
Following considerable discovery, which had been extended on at least three occasions on motion of plaintiffs’ counsel, and after a number of motions relating, among other things, to the arrangement of parties plaintiff, the cause came on for trial before a jury, which, at the conclusion of the testimony returned a special verdict in favor of the defendants.[6] Before entering judgment on the jury verdict, the district judge filed an opinion, with findings of fact and conclusions of law in accordance with the requirements of Rule 52, Fed.R.Civ.P.
I.
We begin our review of the district judge’s opinion with a summary of his explanation, as set forth therein, of the reason for the filing of an opinion, with his findings of fact and conclusions of law, after the submission of the action to a jury and after a jury verdict thereon.[7] He observed at the outset that the plaintiffs’ actions combined suits under the State Fraudulent Conveyance Statute with suits under section 544 of the Bankruptcy Code. He said that under North Carolina law, the issues in the State actions were for the jury, but, since “only equitable relief” was sought in the federal action, the plaintiff in that action “would not [have been] entitled to a jury.” He noted that the plaintiffs had in their complaints demanded a jury trial and the defendants had not “objected] to the plaintiffs’ request for a jury trial but, by silence and inaction, [had] acquiesced in it.” He concluded that under those circumstances neither party was in a position to question the submission of the case to a jury. However, out of an abundance of caution and on the assumption that his “reading of the law and procedure” might be found on appeal to be in error, and that the cause should have been treated as one for resolution by the trial judge and not by a jury,, the district judge declared that he had made “these findings of fact and conclusions of law in accordance with the Federal Rules of Civil Procedure.” [8]
In discussing the merits of the plaintiffs’ claims in his findings of fact and conclusions of law the district judge first identified what he found to be the “essence of the complaints,” i.e., “that the prices paid by Irwin Belk and Sarah Belk Gambrell for the stocks in question were considerably lower than the alleged actual values of the stocks, and that the transfers were effected for the purpose of shielding the assets of William Henry Belk, Jr., from his creditors and at times when, to the knowledge of defendants, William Henry Belk, Jr., was insolvent or about to become insolvent and unable to meet his obligations.” The district judge, then addressed that issue: First, he found that the “prices paid by defendants for the stocks in question were ‘reasonably fair' prices (North Carolina standard) and were ‘reasonably equivalent values’ (federal standard).” He added, in explication of this finding, that plaintiffs’ proof of a greater value was generally either irrelevant or incomplete, observing that the stock sold was not “freely traded” and, therefore, had no established market, unlike the stocks with which the plaintiffs wished to compare the stock in question. He expressly found “book value” an inap *1214 propriate guide for fixing value in this case, adding that “the average of the prices [paid by the defendants for stock transferred to them] was 57% of book value and the range of prices was from 42% to 146% of book value,” (emphasis in text) indicating clearly that book value was of minimum value in determining the market value of any of the stock. He referred specifically to the fact that plaintiffs’ expert witness had been unwilling to express an opinion on fair market or reasonable value of the stock transferred, contenting himself with a comparison of the hypothetical market value of the stock in issue with the market price of certain publicly held stock For this purpose the witness had identified five publicly held merchandising stocks whos© ni8irk6t v&lus would d© comp£ir3.t)l© with the hypothetical value of the closely-held stock involved here. Of these compa-rables, the one which was most like some of the companies involved here (though even here there were important differ-enees) was that of Ivey’s, a department store chain headquartered in Charlotte, North Carolina. The district judge commented, however, that the stock in Ivey’s “was selling in January, 1980 at only 56% of book value, which was a lower percentage of book value than defendants paid in 1980 and 1981 for the stock in the Belk companies.” He pointed out too, that, while the plaintiffs’ claim of under-valuation was based largely on book value, an expert for the defendant testified “that book value is of little help in determining market value; that he had studied other transactions in stock in Belk companies and could see no pattern or trend in the reía-tionship of selling price to book value.” He further found that no transfers were made on Henry Belk’s part with intent to defraud his creditors nor did the defendants have any knowledge or notice of such intent. He dismissed as without a basis in this case any inference of possible fraud based on a “family relationship,” which admittedly was a strained one in this case, Third, he found that the plaintiffs had failed to prove that any transfers were made while Henry Belk was insolvent or that any of the transfers rendered him insolvent or without means to meet his obligations.
jn effect( the district judge stated that he “agree[d] with the jury verdict and adopt[ed] and [found] as facts and conclude[d] as matters of law exactly what the jury found and concluded in its answers to the issues.” He terminated his opinion with the statement that the verdict of the jury was “overwhelmingly supported by the greater weight of the evidence” and to g¡ve added point to this conclusion, he said:
If the jury had answered the issues in favor of the plaintiffs the court (who in hundreds of trials has set aside only three Qr four yerdicts) woul(J not haye been indined to auow such a verdict to stcind
_ After entry of judgment on the jury ver- or> alterna-tively on the district judge s findings of fact and conclusions of law, the plaintiffs have appealed on a number of issues- We find none warranting reversal and afftrm-
^
Before addressing the plaintiffs’ grounds appeal, we set forth a brief summary of the facts herein. Beginning with a single store in Monroe, North Carolina in 1888, William Henry Belk, the father of the bankrupt and the defendants, developed a broadly identified chain of “Belk” department stores, practically all of which were owned and operated by and as separate corporations with different officers and directors. While Mr. Belk owned a substantial amount of stock representing in most, if not in every instance, a majority interest in these corporations, there were with few exceptions local stockholders in all of the corporations. Most of these non-family stockholders were managers and operators of the store or stores owned by the particular corporation in question. Many of these corporations and stores included, along with “Belk” the name of the manager and local stockholder, as, for instance, Belk-Gal-lant, Belk-Leggett and Belk-Hudson. The stores were spread broadly over the South *1215 east. As was to be expected, they varied considerably in size, volume of business, book value, and margin of profit, or profitability. As a rule, all the stores were reasonably successful, though some were far more successful than others.
Before his death in 1952, Mr. Belk distributed a substantial amount of his stock in all the “Belk” store-corporations among his six children: William Henry Belk, Jr.; Irwin Belk; Sarah Belk Gambrell; Henderson Belk; John Belk; and Tom Belk. Though there may have been some differences in the exact stocks given each child in any one corporation under this distribution, the over-all value of stock received by each of the children was roughly the same. Because of the number of Belk children living when the stock was given them by their father before his death, and because of the amount of the Belk stock which was retained by the father or held by the local owners, the direct ownership of stock by any one child in any store-corporation, resulting from such distribution, represented always a small minority interest. By his will, Mr. Belk bequeathed at his death the stock in these corporations which he had retained in his name in trust to his wife and his grandchildren.
A few years after the father’s death, Henry Belk became estranged from the other Belk children. He severed his official connection with the “Belk” corporations, though retaining his individual stock in such corporations. He joined Richard Avery in the ownership of a corporation known as Avery’s, Inc., which, with its corporate headquarters in Florida, was engaged in the development of a chain of department stores, some competing with a “Belk” store. Whether because of over-extended expansion or what-not, Avery’s, Inc. became heavily indebted to a number of banks and suppliers. Henry Belk had indorsed many of the obligations of Avery’s to the banks and had collateralized such obligations with his stock in the “Belk” corporations. With interest rates in the range of twenty per cent in 1980, Avery’s, Inc. was suffering strains on its cash flow by reason of the burden of paying excessive interest and had become delinquent in the payment of interest on obligations held by Citicorp and Maryland National Leasing Corporation, in particular. The notes of Avery’s, Inc., indorsed by Henry Belk with pledges of his blocks of “Belk” stock, to Citicorp and Maryland National were past due and suits on such notes were in some instances threatened or pending.
Faced with this situation, Richard Avery, acting with Henry Belk’s approval, wrote Henderson Belk on January 26, 1980, stating that “they [referring apparently to Henry and himself] were working on a consolidating loan to take them out of the high interest notes and saying if they were successful did you [referring to Henderson Belk] think Belk (referring in this instance to Belk Investment, a family investment corporation) was interested in the stock they had pledged with Maryland National.” After talking by telephone to Avery “several times” Henderson arranged a meeting at his home in Charlotte, North Carolina in late March, 1980. Present at this meeting were Avery, Henry Belk, Avery’s, Inc.’s bookkeeper, Teresa Duncan, Irwin Belk, Sarah Belk Gambrell, Sarah’s attorney, Mr. Estridge, Henderson Belk and Mr. McConnell, an attorney formerly associated with Belk stores. As a result of this meeting, which continued over several days, a large amount of stock in various “Belk” stores was to be acquired by Irwin Belk, Sarah Belk Gambrell, Henderson Belk, and a number of other related “Belk” enterprises and stores. The stock included in the March agreement comprised both unencumbered and collateralized stock. According to Irwin Belk’s testimony, which was not disputed, the purchase price of the stock was to be the asking price therefor as stated by Avery, with the approval of Henry Belk.[9]
*1216 In 1981, again at the request of Avery, seconded by Henry, there were additional transfers of “Belk” stock to the defendants Irwin Belk and Sarah Belk Gambrell for consideration. The only transfers made at this time that are in controversy consisted of approximately an equal amount of unencumbered stock transferred by Henry Belk to the defendants and certain pledged stock which was transferred by Henry Belk to the defendant Irwin Belk, later shared with Sarah Belk Gambrell.
In March, 1982, approximately seven months after the transfer of the stock purchased in 1981 by the defendants, Henry Belk filed his petition in bankruptcy. A year later these actions were filed to void both groups of transfers.
III.
The plaintiffs seek reversal primarily for what they allege to be errors in the district judge’s jury instructions.[10] The main thrust of the plaintiffs’ objection to the district court’s jury charge is directed at that portion of the instructions which asked the jury to determine whether certain transfers in controversy were by Henry Belk or not. They argue that, as a result of posing this issue in his instructions, the district judge had rendered the special verdict itself erroneous, confusing and ineffective. In developing this contention, the plaintiffs say that in the several questions submitted to the jury as the dispositive issues to be resolved by the special verdict the district judge used as the beginning language, “Did Henry Belk transfer [to the defendants]” with intent to defraud creditors, etc. Because of this opening phrase, the plaintiffs posit that the district judge created in connection with each dispositive question, a controlling preliminary issue of whether Henry Belk himself, as distinguished from anyone else, had made the transfer in question, and, therefore, the jury, in answering such question, may have based their conclusion simply on a finding that Henry Belk himself had not made the transfer. And — at least on appeal — they would appear to argue that the district judge should never have submitted to the jury this preliminary or subsidiary issue whether Henry Belk had made any of the challenged transfers but should rather have instructed the jury that all transfers were in effect and in law by Henry Belk.
The initial difficulty with this argument is its inconsistency with the plaintiffs’ position at trial. The plaintiffs submitted at the end of the testimony a supplemental jury instruction, which reads as follows:
Initially, there have been questions raised by the defendants in this case as to whether the transactions complained of were “transfers” from William Henry Belk, Jr. to Irwin Belk and Sarah Belk Gambrell. With respect to the transactions subject to Federal law, you must decide whether a particular transaction was a transfer from William Henry Belk, Jr. to either his brother or sister. The Bankruptcy Code defines a transfer as any transaction direct or indirect, absolute or conditional, voluntary or involuntary, by a person to dispose of or part with an interest in property. 11 U.S.C. § 101(41). In order to find that these transactions violated Federal law, you must first find that William Henry Belk, Jr. disposed of or parted with an interest in property within the year preceding his petition in bankruptcy. If you find this with respect to any transaction, then you must find that transaction to be a transfer subject to Federal law. (Emphasis added)
They added in support of this instruction these authorities: Durrett v. Washington National Insurance Co., 621 F.2d 201 (5th Cir.1980); In re Ewing, 33 B.R. 288 (Bankr.W.D.Pa.1983), rev’d on other grounds, 36 B.R. 476 (W.D.Pa.1984); In re Smith, 24 B.R. 19 (Bankr.W.D.N.C.1982); *1217 In re Marshall, 15 B.R. 738 (Bankr.W.D.N.C.1981).[11] A day later, in the midst of the district judge’s jury instructions the plaintiffs submitted their “Second Supplemental Jury Instructions.” Included was the exact language of their first submission, with this addition:
In determining this issue, you must look beyond the form of the transaction to its substance. Even if a transaction was conducted by a third party, if it involved the property of William Henry Belk, Jr. and was done for his benefit or at his request, you must find it to be a transfer. Even a foreclosure sale by a secured creditor may be considered to be a transfer by the debtor.
The instruction actually given by the district judge was in substance what the plaintiffs, in their first instruction, had requested. He did not, however, include in his instructions the additions made to the first requested instruction of the plaintiffs by the last part of the second supplemental request. Whether this was because the second supplemental request reached the district judge too late or not or because he felt the additional instructions went too far is not evident in the record. The district judge does seem to have considered the additional language of plaintiffs’ second requested instruction to be equivalent to an instruction that the jury should find the transfers in question to have been made by Henry Belk and he questioned whether such an instruction was permissible under the facts of the case. Plaintiffs’ counsel disclaimed any purpose of seeking an instruction that the transfers were as a matter of law those of Henry Belk by their proposed instruction, stating categorically: “We haven’t asked for that.” Under these circumstances, it would seem that the plaintiffs plainly waived any right to an instruction that as a matter of law the transfers were by Henry Belk and are without standing to allege error in the submission of an issue which they recognized, both in their requested jury instructions and by their disclaimer of a contrary demand, was one for the jury.
But assuming that the plaintiffs are not foreclosed by their submissions and by their concession and considering the claim of error on its merits, we are of the opinion that the ruling of the district judge was not erroneous. There were 176 transfers involved initially in this litigation — those in 1980 and those in 1981. These transfers covered both unencumbered and pledged stock of Henry Belk. The 1980 transfers, whether of unencumbered or of pledged stock, resulted from an agreement reached during a three-day discussion between the parties in April of that year. So far as unencumbered stock transferred in either year, those transfers concededly were by Henry Belk. Since jury questions were phrased to include any and all the transfers alleged in plaintiffs’ complaints, the final, *1218 dispositive questions submitted to the jury by the district judge would not consequently have been open to any attack by the plaintiffs. This is so because the questions submitted would have included unencumbered stock which Henry Belk had unquestionably transferred to the defendants. However, the plaintiffs, as we have indicated, dismissed their claims of invalidity against a large number of the transfers. The result was that at trial, the only transfers made in 1980, which the plaintiffs questioned, were those handled by bank pledgees — in fact, the plaintiffs seem in their brief to center their attack only on those negotiated with Citicorp. In 1981, on the other hand, the transfers were limited to transfers either of unencumbered stock or of stock pledged to Integon Insurance Company. There was, however, no dispute that the stock pledged to Integon was actually transferred under a written agreement between Henry Belk and the defendant Irwin Belk, acting on behalf of himself and his sister.[12] Under this written agreement, Irwin Belk purchased the stock pledged to Integon for 8565,585.90. Approximately 8280,000 of the purchase price was to be used to pay the balance due Integon by Henry Belk and the balance was to be payable in “quarterly installments of 815,-000 each commencing March 15, 1987.” Admittedly all the transfers made in 1981, which, made within one year of bankruptcy, represented the basis of the plaintiffs’ federal claim, were thus concededly made by Henry Belk. Accordingly, the challenged instruction had no relevance to these transfers or to the dispositive question submitted as a part of the special verdict in connection with those transfers (Questions 5, 6 and 7), and those parts of the verdict are not open to attack on this ground. Quaker City Gear Works, Inc. v. Skil Corp., 747 F.2d 1446, 1453 and n. 6 (Fed.Cir.1984), cert. denied, — U.S.-, 105 S.Ct. 2676, 86 L.Ed.2d 694; Pritchard v. Liggett-Myers Tobacco Co., 370 F.2d 95, 95-96 (3d Cir.1966), cert. denied, 386 U.S. 1009, 87 S.Ct. 1350, 18 L.Ed.2d 436.[13] On the other hand, all the 1980 transfers remaining in dispute represented deliveries of physical possession of the stock involved, with appropriate powers of attorney to the defendants by the pledgees thereof, after default.
The plaintiffs’ action to set aside or void the 1980 transfers,[14] which are the only ones affected by the challenged instruction, was based on the authority vested in the Trustee under section 544 of the Bankruptcy Act (the so-called “strong-arm” clause of the Act). See In re Euro-Swiss International Corp., 33 B.R. at 879, n. 2. That section gives the Trustee the status of a hypothetical lien creditor in attacking a transfer under a State fraudulent conveyance statute[15] but, while it is the federal law which provides the trustee with his “strong-arm” power, his exercise of such power and its extent are governed entirely by the applicable state law. Angeles Real Estate Co. v. Kerxton, 737 F.2d 416, 418 (4th Cir.1984); Matter of Chaseley’s Foods, Inc., 726 F.2d 303, 307 (7th Cir.1983); In *1219 Re Ludlum Enterprises, Inc., 510 F.2d 996, 999 (5th Cir.1975). Specifically such section confers on the trustee no “greater rights than those accorded by the applicable [state] law to a creditor holding a lien by legal or equitable proceedings.” Matter of Investors Funding Corp. of New York, 452 F.Supp. 771, 775 (S.D.N.Y.1978), quoting 4A Collier on Bankruptcy, 604 (14th ed. 1976).
It seems generally assumed that the avoidance of a transfer under N.C.G.S. § 39-15, which is the controlling state statute in this section 544 action by the plaintiffs, can be said to apply only to conveyances made by the debtor himself. See Case Notes, N.C.G.S. § 39-15; cf., also Allegaert v. Chemical Bank, 657 F.2d 495, 506 (2d Cir.1980). But, under the North Carolina rule, as the district judge said, whether the conveyance, whatever its form, was in substance and fact a conveyance by the debtor-bankrupt or by another such as a pledgee, is a jury question. Ripple v. Mortgage & Acceptance Corp., 193 N.C. 422, 137 S.E. 156 (1927); Wilcox v. Cherry, 123 N.C. 79, 31 S.E. 369 (1898). The district judge instructed the jury in accordance with these principles that, while in form at least, the 1980 transfers of stock were made by the banks, it was a question for the jury to determine whether such conveyances were in substance the transfers by Henry Belk, and, if they were, they were to be treated as transfers by the bankrupt. He added that there was evidence in the record to support that latter conclusion. This, as we have said, was essentially the same instruction as the plaintiffs had requested the court to use in instructing the jury. We can find no error in the district court’s instruction, limited as it was to the 1980 transfers. It complied with the controlling North Carolina law and, as the plaintiffs in their proposed instructions said, it complied essentially with what was the federal rule.
IV..
The plaintiffs would'find error, too, in the district judge’s jury instructions on intent to delay, hinder or defraud creditors in effecting the transfers. The plaintiffs contend the instruction on this issue by the district judge was “an extraordinarily one-sided summary of the evidence and of the parties’ contention on this issue.” However, when the district judge extended to the plaintiffs the opportunity under Rule 51, Fed.R.Civ.P. to state any objections they might have to these instructions, they raised an objection only to the absence of an instruction on “badges of fraud” based on family relationship. The plaintiffs had, it is true, submitted earlier a request to charge on this point. In this requested instruction, the plaintiffs stated that, “[ajnother circumstance which you may consider is that the transfers were between close family members, from brother to brother and brother to sister (citing case). If you find that less than fair value was given for a transfer of stock, then you may take the fact of this family relationship as strong evidence of an intent to hinder, delay or defraud (citing cases). At the very least, you may scrutinize the transaction between the Belks closely.” The district judge did charge on intent to defraud but he did not include the special instruction on “family relationship” as a “badge of fraud.” At the conclusion of the instructions, the plaintiffs raised in the Rule 49 hearing an objection to the omission of any inference of fraud arising out of the family relationship between the bankrupt and his brother and sister. The district judge responded that, under the unique circumstances of this case, he felt the giving of such an instruction was questionable. He referred to the evidence of the estranged relationship between the bankrupt and his brothers and sisters. It was admitted that there had been bitter litigation between the brothers. The bankrupt had sued the other children and they had sued him. There were strong objections from the other members of the family over the use of the “Belk” name by Henry in his new chain and they had actually sought to enjoin Hen-ry from using the “Belk” name in the operation of the Avery stores. The district judge expressed his willingness to add an *1220 instruction on family relations as a “badge of fraud” if the plaintiffs wished it but added that he felt, in fairness, he should refer to the testimony on the relationship between Henry Belk and his brothers and sister and particularly the defendants. On reflection, counsel for plaintiffs withdrew their request for a “family relations” instruction, stating “that’s o.k.” We find no basis for a claim of error in the failure of the district judge to give an instruction which the complaining party in effect thus abandoned.
Since the plaintiffs made no further objection than that on “family relations” in this context, the plaintiffs waived any right to object to the instruction on intent to hinder under Rule 51, Fed.R.Civ.P. Jarrell v. Ford Motor Company, 327 F.2d 233, 236 (4th Cir.1964). Such failure, however, will not foreclose review of the alleged error if it is such that notice thereof is “ ‘necessary to correct a fundamental error or to prevent a miscarriage of justice.’ ” Management Systems Assoc. v. McDonnell-Douglas Corp., 762 F.2d 1161, 1177 (4th Cir.1985). The error suggested on appeal that the instructions on the point were “one-sided,” considered in the light of the actual instruction and the facts, does not qualify for appellate consideration despite failure to object at trial as fundamental error. In fact, on consideration of the instruction as given, we find no basis for characterizing the instruction as “one-sided” or unfair.
V.
The plaintiffs’ next charge error in the district judge’s instruction that tax valuations arrived at as a compromise between taxpayer and the taxing authority, are not controlling in determining fair value, though such valuations may be given such weight as under the circumstances the jury thinks they deserve. They cite Marsack’s Estate v. C.I.R., 288 F.2d 533, 536 (7th Cir.1961), as supporting their position that such instruction was in error. Marsack involved a claim for tax refund in which the taxpayer had “voluntarily fixed” the value of the disputed property.[16] Such a case is entirely different from a compromise arrived at after considerable argument between the taxpayer and the taxing authorities, which was the situation here. Such compromise valuation perhaps may be admissible but it plainly is not “controlling” and this is what the district judge in this case charged. See Miller v. United States, 620 F.2d 812, 827 (Ct.Cl.1980).
The jury is entitled to consider the circumstances under which a disputed valuation was finally agreed to in a compromise agreement. The rule in condemnation cases, where valuation of property is in issue — a situation quite analogous to that under review — is that the price paid in settlement of a condemnation proceeding involving similar land is not ordinarily admissible since “[s]uch payments are in the nature of compromise, to avoid the expense and uncertainty of litigation,” and are not voluntary and do not represent fair indications of market value. 27 Am.Juris.2d 335-336, § 430. This rule has been adopted in North Carolina. In Nantahala Power & Light Co. v. Sloan, 227 N.C. 151, 41 S.E.2d 361 (1947). In that case the court said: “Ordinarily the price paid in settlement in condemnation proceedings is not admissible as evidence to show the value of the condemned land, or the value of land similarly situated.” Id., at 363.[17] If the North Carolina rule is followed, the evidence of this compromise agreement on valuation made in connection with the imposition of the North Carolina intangible *1221 tax, would have been of doubtful admissibility and, even under the more liberal rules of admissibility of some jurisdictions, would have been admissible only for what it was worth and certainly not of controlling import. That was in substance the district court’s instruction. We, therefore, find no error in the district judge’s instructions in this regard.
VI.
As we have said, the two plaintiffs—the Trustee and the Bank—filed separate actions at the same time. There had manifestly been negotiations between the two parties before the suits were filed because the Bank had purchased a part of its claim from the Trustee a few days before the two filed their suits. The two plaintiffs anticipated, it would seem, from the outset that their two actions would be consolidated. After the district judge entered his order fixing time for discovery, the two plaintiffs, apparently acting simultaneously, petitioned for an extension of discovery time and, in so doing, both expressed the view that consolidation of the two actions was appropriate. The district judge granted the motions of the plaintiffs for extension of discovery time and in the same order, in line with the plaintiffs’ suggestion, directed that the two actions should be consolidated for trial. No party raised any objection to that order of consolidation nor is it a ground for appeal herein. The result of the consolidation was to make the two plaintiffs parties plaintiff in the consolidated action. It is under the circumstances improper to characterize either the Bank or the Trustee as an “involuntary plaintiff” in these cases, as the plaintiffs do on appeal; the plaintiffs invited, if they did not actually move for, the consolidation of the two actions, and, after the actions were consolidated, they acquiesced in the consolidation.
Months later, the defendants moved to add the Bank as a party plaintiff in the Trustee’s action, a motion manifestly unnecessary but, if granted, was not harmful to the plaintiffs in view of the earlier consolidation of the two actions. The basis for the motion on the defendants’ part, though, was an “Intercreditor Agreement,” approved by the Bankruptcy Court having jurisdiction of the bankruptcy proceedings. In the beginning of this Agreement, the parties refer to the two actions begun by the plaintiffs observing: “The suit [by the Bank] was commenced in [the Bank’s] own right and also upon claims of the Trustee for Wm. Henry Inc. which were assigned to [the Bank] for $4,000.” The Agreement recited that the Trustee would “purchase all of [the Bank’s] interest in the action for $5,000, payable promptly after approval by the court of this agreement.” It then added: “If allowed by the district court, the actions [e.g., those by the Bank and the Trustee] will be consolidated for all purposes. (Whether or not consolidated, the claims in [the Bank’s] action will be treated for all purposes herein as a part of the Trustee’s ‘Fraudulent Conveyance Litigation’).” The agreement proceeded to provide that the Bank, in return for financing the expenses of the actions which were intended to include, among other items, the payment of a consultant’s fee of $90,000, was to receive a first lien on any recovery in the litigation to cover repayment to it for expenses of litigation paid out of its advances and thereafter was to receive from 60% to 75% of any recovery had, increasing from the 60% to 75% as the amount of the recovery increased. The defendants contended that this agreement by the parties rendered the Bank a partial owner and assignee of the claim in issue. The plaintiffs countered with a motion to substitute the Trustee for the Bank as plaintiff in the action of the Trustee, arguing that the Bank, though a creditor of the bankrupt estate (25%), was merely a creditor and had no more right or interest than any other creditor. They, too, filed in support of their motion a copy of the very same Inter-Creditor Agreement which the defendants had cited as a basis for their motion. In disposing of the two motions, the district judge reaffirmed his order of consolidation *1222 of the cases, and added each plaintiff as a party to the suit of the other.[18]
We find no error in the action of the district judge. Under the “Inter-Creditor Agreement” on which the plaintiffs based their motion to substitute and which was expressly approved and authorized by the Bankruptcy Court, the Trustee was not to be substituted as a plaintiff in the Bank’s suit, but the two cases were to be “consolidated” and as consolidated to be continued. Thus, the very Agreement on which the plaintiffs rely never contemplated a substitution but expected the Bank’s suit to continue as one of the consolidated actions. Moreover, it was disingenuous of the plaintiffs to argue that the Bank was no more than “just one” of the bankruptcy creditors in this litigation. The Bank, under the Agreement on which both parties relied, was financing the entire litigation; its counsel was actively engaged in both suits; and it was to receive the lion’s share of any recovery had in the consolidated suit before any other creditor of the bankrupt received anything. The Bank had far more actual interest in the two cases than the Trustee and its joinder as a plaintiff, even if not already accomplished by the order of consolidation, was certainly permissible. Indeed, under North Carolina practice, the joinder may well have been compulsory. Booker v. Everhart, 294 NC. 146, 240 S.E.2d 360, 365 (1978). Certainly, the plaintiffs, by virtue of what was in effect their request that the two cases be consolidated and by the terms of the Agreement on which they rely, are in no position to complain of the district judge’s refusal to set aside his order of consolidation and to eliminate the Bank as a party plaintiff.
Though not stated in their formal motion for the elimination of the Bank as a party plaintiff in the consolidated action, the plaintiffs, however, contend on this appeal that the continuance of the Bank as a party plaintiff enabled the defendants to prejudice the plaintiff’s case during trial. According to their argument, had the Bank not been a party, much evidence harmful to their position would have been rendered admissible. The district judge took note of this argument in denying the motion of the plaintiffs to substitute the Trustee as plaintiff in the Bank’s ease. He said in that regard: “I am inclined to the view that with or without the bank as a party, there are legitimate ways to show the extent and nature of the bank’s interest in the controversy.” The plaintiffs do not seriously dispute this conclusion of the district judge. Further, the plaintiffs claimed that counsel for the defendants used the Bank’s presence as a party plaintiff as an excuse to make prejudicial comments and arguments at trial without any restraint by the district judge. There was unquestionably considerable bickering between counsel for the respective parties. It cannot be said that this was entirely attributable to one side. The patience of the district judge was severely tried throughout the trial by this bickering. He sought manfully and on the whole successfully to keep counsel on both sides within proper bounds. His conduct was even-handed and marked by impartiality between the parties. On a number of occasions the district judge admonished both sides to “cool it.” After an extended period of argument conducted primarily between counsel, during which there were charges of false statements bandied back and forth by counsel, the district judge dejectedly remarked to counsel: “You folks on both sides are triggered to fight and I *1223 have to keep defusing fights.” Our review confirms the conclusion that both sides were constantly seeking to make side-remarks, to interfere and to interrupt the examination of witnesses, disregarding to some extent the district judge’s admonitions. The district judge ultimately silenced these attempts by his firm, evenhanded and courteous rulings, rebuffing generally any transgression by counsel for either party. In our opinion, there is no evidence of any particular prejudice suffered by the plaintiffs in this give-and-take and we find no basis for reversal on this ground.
VII.
One of the claims of error assigned on this appeal by the plaintiffs was the denial of their motion for a continuance. The ground for such motion was the inadequacy of the time allowed their expert witness for preparing his valuation opinion. Though they had begun their action in March, the plaintiffs did not engage an expert valuation witness until September of that year, at which time the witness began only what he described as merely “preliminary” work. The expert was furnished various records he wished for his “preliminary” examination. He excused any effective use of such records because he discovered in December (two months later) that financial statements were not attached to some of the tax returns produced. Actually, it seems, however, that as late as March 7,1984, the plaintiffs had not determined whether they wished to use this expert witness and they objected at this late date to the defendants’ attempt to depose the expert on this very ground. In their memorandum in opposition to the notice of the defendants to depose Standard Research Consultants, the plaintiffs said that they were acting under orders of the bankruptcy court, that as of March 2,1984, their employment of Standard had been limited to “consultants” and that “in the event that [they] want[ed] to use Standard Research Consultants as witnesses at trial,” such employment must await a formal order allowing such employment by the bankruptcy court. Apparently it was only after this that the plaintiffs determined to employ the consultants to render an opinion or valuation. In any event, it is clear that it was only after March 7, 1984 that the expert began the real work of preparing a valuation opinion to be given at trial. Moreover, in an affidavit of the expert filed in April, 1984 as a basis for plaintiffs’ motion for a continuance, the expert gave such a picture of the stupendous task confronting him in giving an opinion on stock valuation in this ease, if the trial had been delayed to accommodate the plaintiffs’ expert (which was the ground on which a continuance was sought), the trial would have been continued indefinitely. It is interesting that though the witness professed an inability in March to give an opinion on valuation without developing information which he said “[n]o reputable firm would proceed without it,” the expert did testify at trial and gave a valuation opinion on the very stock involved in all the transfers.
It must be remembered that the plaintiffs had over a year to prepare their case for trial. They had been given at least three extensions of discovery time. They had been cautioned on two occasions by the district judge that the cases would be likely tried in May, 1984. They did not begin until March to prepare to use at trial the expert because of whose asserted unpreparedness they based their motion for a continuance. After all, the grant or denial of a continuance is largely committed to the trial judge’s discretion and we can find no abuse of discretion in the refusal by the district judge of the plaintiffs’ motion for a continuance under the circumstances here. Robinson v. United States, 718 F.2d 336, 338, n. 1 (10th Cir.1983); Aurora Enterprises v. National Broadcasting Co., 688 F.2d 689, 696 (9th Cir.1982); American Lease Plans v. Silver Sand Co., 637 F.2d 311, 317-318 (5th Cir.1981).
VIII.
The plaintiffs have raised a number of other points on appeal which require *1224 some discussion. (1) They complain that the denial of their request to depose the defendants’ witness Avinger during trial was unfair since the right to depose plaintiffs’ expert witness Lee was allowed during trial. The reason the district judge ordered Lee deposed was that he presented during his testimony at trial a complex, involved exhibit summarizing his investigation and conclusions which had never been produced as required by the pre-trial orders and which was first seen by counsel for the defendants in the midst of Lee’s testimony. As a condition to admitting such exhibit out-of-time and in violation of the pre-trial order, the district judge granted the defendants the right to depose the expert witness between the adjournment of court and the resumption next day. Under this ruling, the plaintiffs obtained the advantage of having admitted in evidence an exhibit critical to their presentation which, under ordinary practice, would have been ruled inadmissible. The defendants’ expert witness, on the other hand, offered during his testimony no exhibits which had not been produced in keeping with the court’s pre-trial orders. Moreover, defendants’ expert witness confined his testimony almost entirely to a critical analysis of Lee’s testimony. The two situations presented to the district judge in connection with the motions to depose during trial of the two parties were entirely different and the district court’s rulings on the two motions were entirely proper.
(2) It may not be amiss to notice at this point, too, the plaintiffs’ objection to the qualifications of defendants’ expert witness Avinger. They contended he was unqualified to give an opinion on a “closely-held” stock because his experience had been in valuing publicly held stock holdings. This argument by the plaintiffs seems odd since their own expert witness arrived at his valuation of the “closely-held” Belk stock by looking at the prices of five publicly held stock. In any event the qualifications of expert witnesses is primarily an issue for the discretion of the trial judge. Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); Brown By Brown v. Syntex Laboratories, Inc., 755 F.2d 668, 672 (8th Cir.1985); Jones v. Goodlove, 334 F.2d 90, 94 (8th Cir.1964). On a consideration of the record, we are convinced the district judge did not err in permitting the witness Avinger to testify as an expert valuation witness. The weight to be accorded his testimony was one for the jury.
(3) During the cross-examination of the defendant Irwin Belk, the plaintiffs asserted they were prejudicially and erroneously limited or harrassed in their examination.[19] There was a considerable amount of irrelevant and repetitive questioning during the testimony of this witness. On one or two occasions the district judge properly sought, after the subject had been exhaustively and repetitively covered, to move the inquiry forward into other areas. It was done in a most judicious manner and certainly was in order. A good example is the district judge’s action in the sparring between the witness and counsel over the verbal nuances involved in the terms “majority” or “nearly all.” For some three or four pages, counsel and the witness bickered back and forth over whether the witness was a stockholder, a majority stockholder, a director or an officer in a majority of the Belk corporations or whether he was a stockholder in “nearly all,” even though the witness had early conceded that he was a stockholder, director and officer in “nearly all” the Belk corporations. Apparently, too, counsel for the plaintiffs proceeded with his examination in an exceedingly slow manner, because the district judge on an occasion o| two stated more as an aside that perhaps lie should establish a “clock.” The fact of the matter is that we have examined the record carefully and we find no instance in which the plaintiffs’ counsel was denied or hindered in his right to pur *1225 sue any relevant inquiry in his examination of this witness. Counsel terminated his examination voluntarily. We find no ground for reversal here.
(4) The plaintiffs, also, would find error in the refusal of the district judge to admit in evidence plaintiffs’ so-called Exhibit 283, which was said by the plaintiffs to be a “Summary of Immediate Cash Needs” prepared by Teresa Duncan. Teresa Duncan did not testify at trial or identify or verify the exhibit. The plaintiffs sought to introduce this summary initially during the testimony of Henderson Belk. However, Henderson Belk had not prepared the document nor does the record show that he had ever seen the document. Next, the plaintiffs sought to introduce the document on the basis of Teresa Duncan’s pre-trial deposition. That deposition, though, was not in evidence and the original was not available at trial. Beyond this, Teresa Duncan in her deposition testimony, according to a copy of the deposition produced by plaintiffs but not authenticated, said she, “prepared [it] as far as typing it.” So far as she knew, Henry Belk may never have seen the document. Nor is there any evidence that either of the defendants ever saw, had access to, or read or had read to them, this document. In fact, there is no testimony that the “Summary” was referred to at the meeting in 1980. Yet, this was the only professed purpose in introducing the exhibit, e.g., “to prove” what information about Henry’s debts and stock the defendants got at the meeting ...” There was no error in refusing to admit such document for that purpose.
(6) There is another document which the plaintiffs would find to have been improperly refused admission in evidence. During the testimony of the bankrupt himself, counsel for the Bank inquired of the bankrupt if he knew the value of the stock “that was transferred to [his] brother Irwin and sister Sarah.” He said he did not, that he didn’t “have this information.” At this point, the Bank’s counsel began to inquire about a document previously filed by the witness in a proceeding begun by him against the Bank. The objection was made that the counsel could not impeach his own witness with a previous inconsistent statement. The plaintiffs’ response was that the intention was “[n]ot to impeach [the witness] but to show what he had said previously,” since he had testified that “he didn’t have a view today on the subject.” The district judge then ruled that the plaintiffs “may offer [that affidavit] separately, if you wish, but not by way of impeachment.” Later he emphasized: “I have not ruled that you may not show the facts you’re talking about. I have simply ruled it must be done in an orderly way instead of under the guise of attempting to discredit the witness.” The parties at that point began an inquiry whether the affidavit had been submitted for authentication prior to trial, as a prior order of the court had required. At the end of this inquiry the plaintiffs made no effort to offer the affidavit in evidence, perhaps because the affidavit would have set forth in considerable detail the bankrupt’s contention that his financial difficulties were caused by a breach of faith on the part of the Bank. In any event, this objection is without merit.
(7) Finally, the plaintiffs have sought reversal because the district judge at first refused to admit exhibits consisting of summaries prepared by one of their witnesses, which had not been filed and given the defendants before trial, as required under a pre-trial order. Despite this violation of the order, the trial court later admitted these very summaries into evidence. The argument that admission was slightly delayed by the defendants’ objections and by the trial judge’s tentative earlier ruling approaches the frivolous. Had the plaintiffs conformed to the rules there would have been no difficulty in connection with the summaries. The plaintiffs have no right to shift the burden of their own inattention to observing the clearly stated pre-trial orders to the district judge in their assignment of grounds for reversal.
CONCLUSION
We have covered at length the claims of error raised by the plaintiffs. We have *1226 found none of them to merit reversal. We accordingly affirm the judgment below.
AFFIRMED.

. The Trustee is a resident of Florida and the Bank is a foreign corporation. Except for Sarah Belk Gambrell, who at the time of suit was said to be a resident of New York, the individual defendants were residents of North Carolina and the defendant corporations were chartered and had their principal places of business in states other than Florida.

. N.C.G.S. § 39-15.

. The formula used by the plaintiffs in determining which transfers of stock were to be excepted from their voluntary dismissal of challenges to transfers made by Henry Belk depended on the proportion of adjusted book value represented by the purchase price of the stock in question. This formula was applied mechanically without any inquiry as to the market value of the particular stock under review.
It follows that, throughout the proceeding, the plaintiffs appear to focus on book value as the touchstone for determining “fair equivalent." If the particular sale price was at a certain level of book value, the plaintiffs apparently determined that the transfer was violative of the statute, without any regard to the market value of the particular stock. Such a use of book value as a mechanical determinant in the formula for arriving at “fair” value is of questionable propriety. See Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 995 (2d Cir.1981); Dreyer v. Greene, 267 F.2d 44, 45 (5th Cir.1959); In Re Euro-Swiss International Corp., 33 B.R. 872, 885 (S.D.N.Y.Bankr.1983).
Further, the sale of the stock transferred was by blocks of stock and not by individual stocks. Thus, in their purchase of the stock pledged to Citicorp, the defendants acquired stock in almost fifty separate corporations. As a result of their somewhat arbitrary division of the price paid for the entire block of stock among the stocks of the individual companies the purchase price of the stock of any individual stock fell below a certain value, the plaintiffs claimed the purchase was fraudulent but if it was above that figure, it was not. As a matter of fact, some of the stock actually sold above book value under the plaintiffs’ method of valuation.

. The transfers in issue at trial are identified in plaintiffs’ exhibits 2022 and 2023.

. In counsel for the Bank’s request for an extension of time for discovery, this language was added:
The actions are sufficiently related that I would expect that, at a minimum, the actions will be conducted in a coordinated fashion and that, with the Court’s approval, they will be tried together.
The language in the letter of counsel for the Trustee requesting an extension of time for discovery was substantially similar.

. For the use of the Special Verdict, see Rule 49(u), Fed.R.Civ.P. An interesting discussion of "Special Verdicts,” appears in Note, Resolving Inconsistencies in Federal Special Verdicts, 53 Fordham L.Rev. 1089 (1985).

. Havee v. Belk, 589 F.Supp. 600, 607 (W.D.N.C.1984).

. We have set forth in detailed fashion the reasons which prompted the district judge to file his opinion because the plaintiffs, in their briefs in this court, disingenuously profess to find totally unclear and incomprehensible why the district judge made his findings.

. Largely at the instance of Henderon Belk, an agreement was executed under which Henry Belk was given the option to purchase back the stock transferred at any time within a year of the transfer at the price paid by the defendants plus 25%.

. In reviewing the decision below, we confine our consideration of alleged errors to those said to arise during or out of the jury trial, and notice the Rule 52 findings and conclusions of the district judge only as they may have relevance, if any, to the issues in the jury trial. We follow this procedure because both parties proceeded along these lines on appeal.

. Durrett v. Washington National Ins. Co., 621 F.2d 201 (5th Cir.1980), as well as the other cases cited by the plaintiffs in their requested instructions, applied federal, not state law, since the question in that case was whether the transfer was within one year of bankruptcy and thus presented a cause of action under section 548 of the Bankruptcy Code. And the plaintiffs only cited it as authority in the "federal action” and did not cite it as applicable to a state action under North Carolina law. Further, Durrett dealt with a real estate mortgage foreclosure, where the owner retained possession until after the sale under foreclosure. This failure to transfer possession until sale under foreclosure is a primary reason for finding no transfer until after sale. Thus, in Durrett, the Court said that "possession was retained until foreclosure of the deed of trust” and for that reason did not occur until that foreclosure sale since the definition of "transfer” under section 107(d)(2) "covers not only alienations of title but includes surrender of possession.” 621 F.2d at 204.
Corporate stock is a negotiable instrument and, in a pledge of such stock, delivery of possession takes place as an incident of perfecting the transaction. In this case, possession of the collateral was transferred concededly by the bank. This distinguishes it from Durrett and the cases which have followed it, all of which involved real estate foreclosures, as plaintiffs suggest in their proposed instruction. For a view contrary even in the case of real estate foreclosures to Durrett see In re Madrid, 725 F.2d 1197 (9th Cir.1984), and In re Ewing, 36 B.R. 476, 478, n. 5 (W.D.Pa.1984).
In any event, Durrett is inapposite here because it could have application only to the federal action, in which admittedly the transfers in issue were made by Henry Belk.

. The written agreement of sale is included in the record as plaintiffs' exhibit 86.

. In the Note in 53 Fordham L.Rev. at 1091, the writer, in favoring the use of the special verdict said:
Judicial economy also favors special verdict over general verdict. If error affects a general verdict, the entire verdict collapses and all the issues in the case must be relitigated. If a special verdict is used, however, error may only affect a few of the jury’s findings, thus limiting a second trial to the issues covered by the tainted findings.

. The district judge recognized that this issue was one attaching only to the 1980 transfers. Thus, in his instructions on this point he said:
"That would be true of all the transfers involved in the March, April, 1980 situation. I do not recall whether any of the transfers in 1981 were of that type or not.”

. Section 544 is the new version of old section 110, which was characterized as "the so-called ‘strong-arm clause’ of the statute by which the trustee becomes the 'ideal creditor, irreproachable and without notice, armed cap-a-pie with every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings.” In re Kravitz, 278 F.2d 820, 822 (3d Cir.1960); McCannon v. Marston, 679 F.2d 13, 14 (3d Cir.1982).

. This case is similar in principle to our own case of Redman v. United States, 136 F.2d 203, 206 (4th Cir.1943), a condemnation case in which the Government offered in evidence the affidavit of value voluntarily filed by the landowner in a tax assessment proceeding.

. This rule is similar to that which, in eminent domain proceedings, holds that it is discretionary with the trial judge to admit or refuse evidence of other sales of comparable property if such sales were made under threat of possible condemnation. United States v. 145.31 Acres of Land, 54 F.R.D. 359, 361 (M.D.Pa.1972), aff’d without opinion, 485 F.2d 682 (1973).

. On the day of trial, the action originally brought by the Bank, in which the Trustee was later added as a party by the district court, was dismissed by the district court "with prejudice" with the consent of all parties. This suit of the Bank was limited to the 1980 transfers. Did such dismissal qualify as res judicata of the attack by plaintiffs on the 1980 transfers? See 9 Wright & Miller, Federal Practice & Procedure, § 2367, pp. 185-186 (1971 ed.): "Dismissal with prejudice, unless the court has made some other provision, is subject to the usual rules of res judicata and is effective not only on the immediate parties but also on their privies;” and Nash Board of Education v. Biltmore Company, 640 F.2d 484, 486-487 (4th Cir.1981), cert. denied, 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 rehearing denied, 454 U.S. 1117, 102 S.Ct. 692, 70 L.Ed.2d 654. No party has discussed this point.

. Irwin Belk was called as a witness by the plaintiffs and examined as an adverse party. See 611(b), Fed.R. of Evid.