**In re RICHMOND PRODUCE COMPANY, INC., Debtor.**

**John T. KENDALL, Plaintiff,**

**v.**

**Donald SORANI, the Estate of Patricia Sorani, Bank of California, et al., Defendants.**

Bankruptcy No. 4–89–00513 N3. Adv. Nos. 4–90–0052 AT, 91–4618 AJ; 91–4664 AN.

United States Bankruptcy Court, N.D. California.

March 22, 1993.

Irving J. Kornfield, Kornfield, Paul & Bupp, Oakland, CA, T. Scott Tate, Bronson, Bronson & McKinnon, Santa Rosa, CA, for plaintiff Kendall.

Peter Ferris, Lempres & Wulfsberg, Oakland, for defendants & cross-defendants Donald Sorani and Estate of Patricia Sorani.

William J.A. Weir, Murphy, Weir & Butler, San Francisco, CA, for defendant Bank of California.

Douglas Drayton, Thelen, Marrin, Johnson & Bridges, San Francisco, CA, for defendant Mechanics Bank.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

In this adversary proceeding, the plaintiff John Kendall (the "Trustee"), the trustee of the above-captioned chapter 11 estate, seeks judgment against defendant Bank of

California, N.A. ("BanCal") in the principal amount of $1.5 million as the recipient of a constructively fraudulent transfer in connection with a leveraged buyout. For the reasons stated below, the Court finds for the Trustee. The Court concludes that the events that took place on March 11, 1988 constituted a fraudulent transfer of the above-captioned debtor's (the "Debtor") property, that the Debtor was undercapitalized when the transfer occurred and was rendered insolvent by the transfer, that the Debtor received no value from the transfer, that BanCal was a mediate or immediate transferee of the Debtor's property, and that BanCal was on inquiry notice as to the voidability of the transfer.

## SUMMARY OF FACTS

At all times relevant to this adversary proceeding, the Debtor, a California corporation, was a produce wholesaler in Richmond, California. During most of 1987 and before, the Debtor's stock was solely owned by Donald and Patricia Sorani (the "Soranis"). The Debtor had been operating profitably for a number of years and had an excellent credit rating. This credit rating enabled it to negotiate favorable credit terms with its suppliers, many of whom had rights to prompt payment protected by state and federal law.

In August 1987, the Soranis entered into a written agreement for the sale of their stock in the Debtor to John Clow ("Clow"). The Soranis agreed to sell Clow most of their stock for approximately $4 million, approximately $2 million of which was to be paid in cash at the close of escrow and the remaining $2 million to be evidenced by a promissory note (the "Clow Note") payable at the rate of $25,000 per month plus interest. The Soranis were also permitted to cause the Debtor to redeem the remainder of their stock for approximately $1 million in cash and tangible personal property.

Although the sale did not close until December 3, 1987, Clow was permitted to take control of the Debtor during the fall of 1987. During the fall of 1987, Clow attempted to arrange for a line of credit for the Debtor, secured by the Debtor's assets, as a source of the funds for the cash portion of the purchase price. Clow received offers for lines of credit from three banks, including BanCal. As part of these negotiations, BanCal was informed of the terms of the buyout and of the proposed use of the funds to be advanced pursuant to the line of credit. Clow chose not to accept BanCal's offer, choosing instead an offer made by Imperial Bank. Ultimately, however, Clow was unable to finalize the line of credit agreement with Imperial Bank in time for the December 3, 1987 close of escrow. Instead, Imperial Bank made a short term loan to the Debtor (the "Imperial Bank Loan") in the approximate amount of $1.5 million. Clow used those funds to satisfy the cash portion of his purchase price obligation to the Soranis. Clow collateralized the Imperial Bank Loan with a certificate of deposit purchased with his own personal funds (the "Imperial Bank C/D").

The sale agreement required the Clow Note to be collateralized either by a pledge of the Debtor's stock or a letter of credit. Clow was permitted to choose the form of the collateral. Notwithstanding that right, at the December 3, 1987 close of escrow, Sorani indicated that he would not go through with the sale unless a letter of credit were provided. Clow agreed, provided he be given time to arrange for the letter of credit. The Soranis were given an interim security interest in various assets of the Debtor and Clow, which was to be released when the letter of credit was provided.

Beginning in January 1988, Clow began negotiating with BanCal for the issuance of a letter of credit to secure the Clow Note (the "Letter of Credit"). Clow dealt with a loan officer at BanCal's Oakland office, Walter "Buck" Reed ("Reed"). Reed expressed concern about the enforceability of the transaction. In particular, it concerned him that, while the Debtor was apparently providing the funds that BanCal would require as security for the Letter of Credit, the Debtor did not appear to be getting any benefit from the Letter of Credit. Reed

solicited legal advice from James Purvis ("Purvis"), an attorney in BanCal's legal department.

Purvis spoke to two attorneys at the law firm of Cooper, White & Cooper (the "Cooper Firm") about Reed's concerns—Ed Wynne and Walter Hansell. The Cooper Firm represented Clow and, since Clow had taken over the Debtor in December 1987, represented the Debtor as well. Wynne wrote a letter to Purvis reassuring Purvis that the transaction was not vulnerable to attack by a creditor or trustee of the Debtor. He represented that the funds used to obtain the Letter of Credit would be Clow's personal funds.[1] He also represented that the Debtor was obtaining substantial benefits as a result of the issuance of the Letter of Credit. Purvis understood this letter to be an opinion letter and, in reliance on the opinion and on the prestige of the Cooper Firm, advised Reed that the proposed transaction was sound.[2]

The funding and issuance of the Letter of Credit all took place on the same day—March 11, 1988. On that day, Mechanics Bank advanced a line of credit for $1.5 million to the Debtor, secured by all the Debtor's assets (the "Mechanics Bank Line of Credit"). The Debtor wrote a corporate check payable to BanCal (the "Corporate Check") which it delivered to Mechanics Bank. Mechanics Bank negotiated the corporate check, issued a cashier's check for $1.5 million (the "Cashier's Check") payable to BanCal, and gave the Cashier's Check to Clow. The remitter of the Cashier's Check was listed as "Clow–Richmond Produce." Clow took the Cashier's Check to BanCal, purchased a certificate of deposit in his own name (the "BanCal C/D"), and pledged the BanCal C/D as security for the Letter of Credit. As a result of these transactions, BanCal issued the Letter of Credit.

The Debtor began experiencing cash flow difficulties shortly after the close of escrow on December 3, 1987. The Debtor's bank account was substantially overdrawn twice during January 1988. The 1987 year end financial statements showed a negative cash balance of approximately $550,000. Thereafter, Clow took over cash management. For the most part, he held checks for accounts payable until he was certain the Debtor had cash to cover them.[3] Nevertheless, in the spring of 1988, the cash flow problems increased. On April 6, 1988, Growers Produce, an important supplier, wrote to the Debtor, complaining about the Debtor's late payments. Another supplier stopped shipping to the Debtor on several occasions because of late payments. These problems continued during the summer of 1988. The final blow was dealt when the key industry credit rating publication—referred to as the "Blue Book"—lowered the Debtor's credit rating after reviewing the Debtor's audited financial report for 1987.

As a result of this lowered credit rating, the Debtor's cash flow problems became acute. In September 1988, notwithstanding Clow's careful cash management, the Debtor's bank account was once again overdrawn. Clow was forced to borrow money from a business associate to cover the overdraft. In November and December, the Debtor received a number of past due letters from creditors. In December 1988, the Debtor received letters of complaint from the State Department of Food and Agriculture and the United States Department of Agriculture.

The Debtor failed to pay the first installment real property taxes which were due

---

1. There was substantial evidence presented that it was Clow's intention to use the funds advanced pursuant to the Mechanics Bank line of credit to pay off the Imperial Bank Loan. Clow then could have used the Imperial Bank C/D—which had been purchased with his own personal funds—to collateralize the Letter of Credit.

2. Hansell testified that the Cooper Firm did not view the Cooper Letter as an opinion letter. Rather, they understood it to be a mere recitation of facts, as known by them, concerning the transaction. They expected BanCal to draw its own legal conclusions.

3. The evidence was conflicting on the extent to which Clow held checks for accounts payable after they were past due. Clow testified that the fact that checks had been issued did not mean that the accounts payable were due. However, other evidence contradicted this testimony. The Court found the other evidence more credible.

on December 10, 1988. This constituted a default under the Debtor's lease with the Soranis which, if uncured, would give the Soranis the right to make demand on the Letter of Credit for payment of the balance of the purchase price. The Soranis gave notice of the default to the Debtor. On February 2, 1989, the default not having been cured, the Soranis made demand on the Letter of Credit. Shortly thereafter, BanCal paid the Soranis and enforced its security interest in the BanCal C/D.

## DISCUSSION

■ The Trustee contends that the Debtor received less than reasonably equivalent value as a result of the series of transfers that took place on March 11, 1988. He further contends that the Debtor was both insolvent and undercapitalized at the time of the transfers. Alternatively, he contends that the Debtor was rendered insolvent and undercapitalized as a result of the transfers. The Trustee bases his claims on both 11 U.S.C. § 548(a)(2)(B)(i) and (ii) and on Sections 3439.04(b)(1) and 3439.05 of the California Civil Code, which claims the Trustee may assert by virtue of 11 U.S.C. § 544(b).[4] The Trustee seeks recovery from BanCal pursuant to 11 U.S.C. § 550(a)(1) on the theory that BanCal was the initial transferee of the Cashier's Check. Alternatively, he seeks recovery from BanCal pursuant to 11 U.S.C.

§ 550(a)(2) on the theory that BanCal was an immediate or mediate transferee. Each element of the Trustee's claim is disputed by BanCal. The Court will address each of these disputed issues below.[5]

## ISSUES

A. DID BANCAL RECEIVE A TRANS-FER OF THE DEBTOR'S PROPER-TY?

BanCal contends that it did not receive property of the Debtor when it received the Cashier's Check. In support of this argument, it relies on the principle that, by issuing a cashier's check, a bank becomes independently obligated to the payee of the check to honor the check when it is presented. This question has already been litigated in this adversary proceeding with a result unfavorable to BanCal's position. *See In re Richmond Produce Co.*, 118 B.R. 753 (Bankr.N.D.Cal.1990). BanCal sought summary judgment on this same basis. Its motion was denied. The only reason this argument is not improper is that no countermotion for partial summary judgment was filed by the Trustee with regard to this issue.

■ State law—in this case, California law—determines the nature and extent of a debtor's interest in property. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct.

---

**4.** It is well settled that fraudulent transfer law applies to leveraged buyouts, even in the Ninth Circuit. In *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 164, n. 10 (3d Cir. 1992), the Court noted that the Ninth Circuit is a possible exception to this rule based on its ruling in *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir. 1988). However, the Ninth Circuit's ruling in *Lippi v. City Bank*, 955 F.2d 599 (9th Cir.1992) makes it clear that this Circuit will follow the majority rule and hold a transfer made in connection with a leveraged buyout fraudulent in an appropriate case.

**5.** BanCal raises two arguments in its defense which the Court views as too frivolous to require discussion in the text. First, it contends that the Trustee may not recover from BanCal because the initial transfer—which it contends was made to Clow—may not be avoided, the claim having been discharged in Clow's bankruptcy. Assuming arguendo that the initial transfer was to Clow, the fact that Clow may not

be joined in this proceeding and may not be subjected to a judgment does not mean that the transfer may not be avoided. The authority cited by BanCal in support of this proposition—*Weinman v. Simons (In re Slack–Horner Foundries Co.)*, 971 F.2d 577 (10th Cir.1992)—does not bind this Court and is not persuasive. Second, BanCal contends that the transfer may not be avoided because there is no bona fide claim against the estate that existed at the time of the transfer. Section 3439.05 (although not Section 3439.04(b)(1)) of the California Civil Code makes the existence of such a claim a prerequisite to recovery. The Ninth Circuit has established a similar requirement under 11 U.S.C. § 548(a)(2)(B) when a leveraged buyout is involved. *Kupetz v. Wolf*, 845 F.2d at 849–850 (9th Cir.1988). However, the Trustee proved to the Court's satisfaction that there was a bona fide claim against the estate that existed prior to the March 11, 1988 transfers. BanCal's attempts to discredit this claim were not persuasive.

914, 918, 59 L.Ed.2d 136 (1978); *In re Sierra Steel, Inc.*, 96 B.R. 271, 273 (Bankr. 9th Cir.1989). California law clearly supports the view that the purchaser has a property interest in a cashier's check before it is delivered. *Garthwaite v. Bank of Tulare*, 134 Cal. 237, 241, 66 P. 326 (1901); *Burke v. Mission Bay Yacht Sales*, 214 Cal. App.2d 723, 732, 29 Cal.Rptr. 685 (1963). The *Burke* Court states as follows:

> [E]ven though the plaintiff was not actually the drawer of the instant cashier's check, her rights in the premises [sic] simulated those of the drawer of an ordinary check. She paid $10,000 to the bank for which it issued its check payable, at her request to the defendant.... For the purpose at hand, there is no legally sufficient distinction between such a situation and that which would have existed if she had deposited $10,000 with the bank and requested its certification of her check payable to the defendant. In the latter instance the payee's right to the $10,000 would not have come into being until the check had been delivered, and in the meantime the plaintiff would have had the right to cause it to be canceled and her account credited with the amount thereof. The check was the property of the plaintiff until delivery.

*Burke*, 214 Cal.App.2d at 732, 29 Cal.Rptr. 685 (citation omitted).

■ BanCal concedes that there is no California authority to rebut the cases cited by the Trustee. It simply argues that the cases are badly reasoned. The Court does not agree. Section 101(54)[58] of the Bankruptcy Code defines "transfer" as follows:

> [E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

This definition is sufficiently broad to include within its scope a transfer that results in a modification of the form or value of the property transferred.

■ As a practical matter, delivery of the Cashier's Check to BanCal must be viewed as a transfer. Prior to delivery, the Debtor could have returned the Cashier's Check to Mechanics Bank and had $1.5 million credited to its account. As a result of the delivery, BanCal was given the power to obtain $1.5 million from Mechanics Bank, and the Debtor lost that power. Under these circumstances, it makes no sense to conclude that no transfer occurred.

**B. DID THE DEBTOR RECEIVE REASONABLY EQUIVALENT VALUE FOR THE TRANSFER?**

BanCal argues that the transfer of the Cashier's Check may not be avoided because the Debtor received reasonably equivalent value as a result of the transfer as required by Section 548(a)(2)(A) of the Bankruptcy Code. It cites the following items of consideration: (1) the Letter of Credit; (2) Clow's guaranty of the Mechanics Bank $1.5 million line of credit (the "Guaranty"); (3) Clow's pledge to Mechanics Bank of his stock in the Debtor to secure the $1.5 million line of credit (the "Pledge"); (4) Clow's obligation to repay the $1.5 million received from the Debtor; and (5) Clow's skill and knowledge in running the Debtor. For the reasons set forth below, the Court disagrees that any of these items provided the Debtor with value reasonably equivalent to its loss of $1.5 million in cash.

(1) *Letter of Credit.* BanCal contends that the issuance of the Letter of Credit had value to the Debtor because it secured certain obligations of the Debtor to the Soranis.[6] This contention is erroneous. The Letter of Credit did not secure the Debtor's obligations to the Soranis. Rather, the Soranis' agreements with the Debtor and Clow provided that, if the Debtor

---

**6.** The Debtor had various monetary obligations to Sorani, including: (a) an obligation which was evidenced by a promissory note in the amount of $205,000, (b) a lease obligation with respect to the building occupied by the Debtor

which was owned personally by the Soranis, and (c) payments due under an employment agreement. The first two obligations existed prior to the sale to Clow. The third was incurred in connection with the sale.

defaulted in its obligations to the Soranis, the Soranis could make a demand on the Letter of Credit. However, the funds received pursuant to that demand would not be applied to satisfy the Debtor's obligations to the Soranis. Rather, they would be applied to pay the balance of the purchase price for the Debtor's stock. The Debtor would remain obligated for the full amount of its obligations to the Soranis.

(2)–(3) *Guaranty and Stock Pledge.* BanCal contends that the Guaranty and the Pledge, both of which were given to Mechanics Bank to induce it to extend the line of credit, gave value to the Debtor. This contention makes no sense. The purpose of the line of credit was to assist Clow in paying the Soranis the balance of the purchase price for the Debtor's stock. If that transaction did not benefit the Debtor—and the Court is persuaded that it did not—any consideration given by Clow to Mechanics Bank to facilitate the transaction did not benefit the Debtor either.

■ (4) *Obligation to Repay Debtor.* BanCal contends that Clow's obligation to repay the Debtor for the $1.5 million "loan" constituted reasonably equivalent value for the transfer. This argument fails for two reasons. First, the Court is persuaded that Clow never assumed any such obligation. No promissory note was executed. The obligation was not shown on Clow's personal financial statement. The reference to the transaction as a loan to Clow in the minutes of the Board of Directors meeting in December 1987 appeared to be fabricated by Clow's attorney, Ed Wynne, after the fact. Clow did testify, and the Court was persuaded, that he expected the funds in the Certificate of Deposit to be returned to the Debtor as the purchase price was paid down and thus the BanCal C/D became unnecessary. However, Clow's expectation does not equate to a commitment that he would repay the sum. Clow expressed no sense of obligation to repay the sum from his personal funds in the event a demand was made on the Letter of Credit by the Soranis and the BanCal C/D was forfeited.

Second, there was no evidence that Clow had the probable ability to repay the loan in the near future. He was required to borrow from BanCal to pay his taxes in the Fall of 1987. He was planning to finance the Debtor's vehicles to pay capital gains taxes on the sale of a company he had previously sold. Most telling, he was in fact not able to pay the Soranis the balance of the purchase price from personal funds when the Debtor was unable to maintain the payments on the Clow Note so that the Certificate of Deposit could have been liquidated and the funds returned to the Debtor. Given the funds Clow had invested in the Debtor, if Clow had had the ability to repay this sum to the Debtor, surely he would have done so in order to preserve his investment.

■ (5) *Clow's Managerial Skills.* Finally, BanCal contends that Clow gave value to the Debtor in return for the $1.5 million transfer by providing managerial skills to the Debtor. This argument ignores the fact that Clow was paid $20,000 per month for these services. Given the rapid demise of the Debtor after the sale, it is difficult to argue that the value of his services exceeded this amount. As noted by the Trustee, at least one other court has rejected this type of value as sufficient. *United States v. Gleneagles Investment Co.,* 565 F.Supp. 556 (N.D.Pa.1983), *affirmed sub nom., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3rd Cir.1986), *cert. denied sub nom., McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Moreover, treating such ephemeral benefits as value seems inconsistent with the approach taken in other bankruptcy contexts. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (sweat equity not new value sufficient to support an exception to the absolute priority rule).

## C. WAS THE DEBTOR INSOLVENT AT THE TIME OF THE TRANSFER?

The Trustee contends that the Debtor was insolvent even before the transfer of the Cashier's Check on March 10, 1988.

While this may be true, the Court finds that the Trustee has not carried his burden of proof on this issue.

A balance sheet prepared by William F. Leimbach (the "Leimbach Balance Sheet") showed the Debtor as having a net worth of $2,426,268 as of the end of 1987. However, Clow did not inform Leimbach about the Imperial Bank Loan, and this obligation was not reflected on the Leimbach Balance Sheet. The parties agreed that the obligation should have been included. They differed on what should have been the corresponding debit entry.

The Trustee's expert accountant testified that the corresponding debit entry should be a reduction in equity. This would have reduced the Debtor's net worth by $1,452,000 to approximately $1 million. BanCal's expert and Leimbach testified that the debit entry should be to the asset side of the balance sheet to reflect the fact that the obligation was fully collateralized by cash. The Court was persuaded that the latter treatment was more reasonable. Thus, the inclusion of the Imperial Bank transaction on the balance sheet would not have affected the Debtor's net worth.

The parties also disagreed as to whether the value of good will and organization expense should be included in determining the Debtor's solvency. BanCal argued that it should be. The Trustee contended that it should not. The Court agrees with the Trustee on this issue. The evidence presented was that the value of the asset described on the Leimbach Balance as organization expense was based on Clow's expenses in connection with the purchase of the Debtor's stock. The value of good will was simply the difference between the value of the Debtor's other assets, less its obligations, and the purchase price that Clow had agreed to pay for the Debtor.

The evidence established that these values were calculated in a manner that was consistent with generally accepted accounting principles. However, generally accepted accounting principles do not control the determination of solvency in a trustee's avoidance action. *In re Sierra Steel, Inc.,* 96 B.R. 275, 278 (Bankr. 9th Cir.1989); *In re Ohio Corrugating Co.,* 91 B.R. 430, 438 (Bankr.N.D.Ohio 1988). Rather, the inquiry must be to what extent an asset would have value for a creditor attempting to satisfy its claim. Good will and organization expense could not be sold to satisfy a creditor's claim. Thus, these assets should be disregarded in determining solvency, at least under the facts presented here.

In reaching this conclusion, the Court finds extremely persuasive the fact that Section 500(b)(1) of the California Corporations Code, which prohibits shareholder distributions unless a corporation is solvent, requires that good will and organization expenses be excluded from a determination of solvency. When good will and organization expense are omitted, the Debtor's net worth is reduced to $1,034,268.

The parties also disputed the appropriate valuation of the Debtor's vehicles. The vehicles were valued at $1,348,000 on the Leimbach Balance Sheet. This valuation was based on a supposedly independent appraisal of the vehicles. The Court was persuaded that the value was one ascribed to the vehicles by the Debtor itself and "rubber stamped" by a friendly business associate of the Debtor. The Court was not persuaded that the Debtor's valuation of the vehicles was necessarily accurate. Clow was attempting to obtain a line of credit for the Debtor. It was his desire to have the Debtor's assets listed at as high a value as possible. The Court is inclined to believe that this value was inflated.

However, the Trustee failed to present credible evidence about the actual value of the vehicles. To find the Debtor insolvent, the Court would have to conclude that the vehicles were worth less than $400,000. No evidence was presented to support such a finding.

## D. WAS THE DEBTOR RENDERED INSOLVENT BY THE TRANSFER?

On March 11, 1988, the Debtor incurred a $1.5 million liability to Mechanics Bank pursuant to the line of credit. Both parties' experts agreed that this obligation

would have to be included on the liability side of the Debtor's balance sheet after March 11, 1988. However, again, they disagreed about the proper offsetting debit entry. The Trustee's expert testified that the entry should be a reduction to shareholder's equity. BanCal's expert testified that the entry should be a current asset characterized as "Note Receivable—Shareholder." Leimbach agreed with BanCal's expert, although he testified that he would label the entry "Restricted Cash" as with the Imperial Bank transaction.

The Court is persuaded that the proper debit entry is a reduction in shareholder equity in the amount of $1.5 million. Thus, it concludes that the March 11, 1988 transfer gave the Debtor a negative net worth of about $500,000. It may be that BanCal's and Leimbach recommended debit entry is in accordance with generally accepted accounting principles. However, the Court believes that the Trustee's accountant's recommended debit entry more fairly reflects the actual financial condition of the Debtor after the transfer from a creditor's point of view.

There was no credible evidence that Clow assumed a personal obligation to repay the Debtor for the advance of the $1.5 million. Clow testified that it was his expectation that, as the purchase price was paid and the exposure on the Letter of Credit reduced, the funds in the BanCal Certificate of Deposit would be returned to the Debtor. He did not testify that, if this source of repayment to the Debtor should fail, he considered himself obligated to repay this amount to the Debtor from his personal funds.

Moreover, the Court was persuaded that on March 11, 1988, Clow had no realistic ability to repay the $1.5 million to the Debtor within a reasonable time. Clow's personal financial statement shows a substantial net worth only because of the substantial value placed on his interest in the Debtor. Since the value of the Debtor depends in large part on Clow's own solvency, he cannot rely on that value to prove his own solvency. Substantial evidence was presented that Clow did not have the ability to pay his own personal tax liability and planned to borrow against the Debtor's vehicles to pay that liability.

Leimbach suggested that the debit entry should be an asset called "Restricted Funds" as with the Imperial Bank C/D. However, the Imperial Bank C/D was dedicated to the payment of the Debtor's obligation and thus properly included as an asset of the Debtor. By contrast, the Ban-Cal C/D was dedicated to the payment of Clow's obligation. It cannot fairly be called an asset of the Debtor unless Clow's obligation to the Soranis for the balance of the purchase price is also characterized as an obligation of the Debtor. Under either treatment, the Debtor would have a negative net worth after of March 11, 1988.

### E. WAS THE DEBTOR UNDERCAPITALIZED PRIOR TO THE MARCH 11, 1988 TRANSACTION?

The Court is persuaded that the Debtor was undercapitalized for the type of business in which it was engaged immediately upon the December 3, 1987 close of escrow. 11 U.S.C. § 548(a)(2)(B)(ii); Cal.Comm.Code § 3439.04(b)(1). The fact that the Debtor was overdrawn twice during January 1988, both times by fairly substantial amounts, is not determinative. Clow blamed this on poor cash management, and he may well be right. The Debtor had had substantially more capital and less expense before the sale so that careful cash management was not necessary.

It may be that, in another industry, with Clow's careful cash management, the Debtor might have been able to survive and even flourish. However, in light of the protections given growers by federal and state law and the careful monitoring of produce wholesalers' creditworthiness by the industry, the Debtor's operations appear to have been doomed from the time the December 3, 1987 escrow closed. The "Blue Book" based its down rating of the Debtor on the Debtor's audited financial statement for 1987, reflecting the Debtor's capitalization after the close of escrow. Based on this down rating, the Debtor could no longer obtain credit from its sup-

pliers. The only reason the Debtor was able to continue operating for as long as it did was that the "Blue Book" publishers did not obtain the financial statement until August 1988.

The Debtor's problems may well have been aggravated by the bankruptcy, delayed payment by one of its major customers, and attempts at sabotage by Sorani. However, the Court was not persuaded that these factors were a significant cause of its failure. Even had these factors not been present, once the 1987 financial statement was issued, it was "reasonably foreseeable" that the Debtor would have its credit cut off and would ultimately fail. *Cf. Credit Managers Ass'n of S. California v. Federal Co.,* 629 F.Supp. 175, 183–188 (C.D.Cal.1985); *Moody v. Security Pacific Business Credit,* 971 F.2d at 1073. Given the Court's findings, it goes without saying that the debtor was undercapitalized after the March 11, 1988.

## F. WAS BANCAL THE INITIAL TRANSFEREE OF THE CASHIER'S CHECK?

■ The Trustee contends that BanCal was the initial transferee of the Cashier's Check and thus not entitled to a defense under 11 U.S.C. § 550(b)(1). The Court disagrees. The evidence is clear that Clow picked up the Cashier's Check from Mechanics Bank and delivered it to BanCal. Whether this should be considered a transfer, or Clow treated as a mere conduit, depends on whether Clow exercised dominion and control over the Cashier's Check. *In re Bullion Reserve of North America,* 922 F.2d 544, 548–549 (9th Cir.1991), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).[7] If a messenger service had picked up the Cashier's Check from Mechanics Bank and delivered it to

BanCal, the messenger service would not have been deemed a transferee.

However, clearly, Clow was no mere messenger. Rather, Clow exercised complete control over the transaction. It was devised and executed for his benefit. Under these circumstances, the Court must conclude that the Cashier's Check was transferred to Clow when he picked it up from Mechanics Bank. Thus, BanCal was not an initial transferee pursuant to 11 U.S.C. § 550(a)(1). Instead, it was an immediate transferee pursuant to 11 U.S.C. § 550(a)(2) and entitled to assert a defense under 11 U.S.C. § 550(b)(1).[8]

## G. DID BANCAL PROVE A DEFENSE UNDER 11 U.S.C. § 550(B)(1)?

■ Given the Court's conclusion that BanCal was an immediate or mediate rather than initial transferee, the Trustee may not recover the amount of the avoided transfer if BanCal proves that it gave value for the transfer, in good faith, without knowledge of the voidability of the avoided transfer. 11 U.S.C. § 550(b)(1). BanCal has the burden of proof on these issues. *See In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 (6th Cir.1990).

■ BanCal clearly gave value in return for the Cashier's Check—a $1.5 million certificate of deposit issued in Clow's name. Section 550(b)(1) does not require that the value provided be given to the Debtor. Such a requirement would defeat the purpose of the defense since an immediate or mediate transferee would seldom, if ever, give value to the Debtor, with whom it would normally not be in direct contact. The Court is also persuaded that BanCal acted in good faith in connection with the transfer. Reed appears to have acted for

7. Neither party appears to have considered the possibility that Mechanics Bank, rather than Clow, is most appropriately viewed as the initial transferee. Given the Court's conclusion that Clow was a transferee, not just a conduit, the Court need not consider this question. The only effect of finding Mechanics Bank to be the initial transferee rather than Clow would be to change BanCal from an immediate to a mediate transferee. However, both mediate and imme-

diate transferees are entitled to a defense under 11 U.S.C. § 550(b)(1).

8. Any suggestion that *Kupetz v. Wolf,* 845 F.2d at 848–850, should be read to impose the requirement that the initial transferee in connection with a leveraged buyout have knowledge of the voidability of the transfer has been dispelled by *Lippi v. City Bank,* 955 F.2d at 610–611.

normal business motives—e.g., a desire to make a profit.

However, BanCal failed to persuade the Court that it acted without knowledge of the voidability of the transfer. BanCal had extensive knowledge of the Debtor's financial condition as a result of the negotiations leading to its offer of a line of credit to the Debtor in the Fall of 1987. BanCal knew the details of the December 3, 1987 sale and the fact that Clow intended to heavily leverage his purchase of the Debtor's stock. This was sufficient to put BanCal on notice that the proposed transfer would render the Debtor insolvent and/or undercapitalized. Had BanCal investigated further the effect of the transaction on the Debtor's financial condition, the Court is satisfied that it would have discovered that the March 11, 1988 transaction rendered the Debtor insolvent.

BanCal also was on inquiry notice that the funds it accepted to secure the issuance of the Letter of Credit might be property of the Debtor and, that the transfer might provide the Debtor with less than reasonably equivalent value. Reed expressed that concern by contacting Purvis. However, Purvis failed to make a reasonably diligent investigation of the facts. Instead, he simply relied on vague assurances of a law firm known to represent Clow that the funds used to purchase the BanCal C/D would be Clow's personal funds and that the transfer would benefit the Debtor. He made no attempt to verify or corroborate those representations. He did not even advise Reed to be sure the funds actually used to purchase the BanCal C/D were in fact Clow's personal funds. Furthermore, the Cashier's Check itself put BanCal on inquiry notice. The check lists the Debtor as a co-remitter. The fact that BanCal paid no attention to that notation does not relieve it from responsibility. Given the facts known to it, BanCal had an obligation to inquire as to the source of the funds.[9]

Purvis appears to have viewed the Cooper Letter as an opinion letter. Thus, he may have viewed the Cooper Letter as a form of guaranty. Viewed in this light, his failure to verify the substance of the Cooper Letter is perhaps not surprising. However, the representations made by the Cooper Firm did not alter the facts as they were known by BanCal. Therefore, they cannot protect BanCal from having imputed to it knowledge of those additional facts that it would have discovered had it made a diligent inquiry.

## H. IS THE TRUSTEE ENTITLED TO PREJUDGMENT INTEREST?

The Court has the discretion to award prejudgment interest. 11 U.S.C. § 544(b); *Home Savings Bank, F.S.B. v. Gillam*, 952 F.2d 1152, 1161 (9th Cir.1991). The Court concludes that, under these circumstances, interest should accrue on the sum transferred from the transfer date—March 11, 1988. The rate of seven percent per annum is appropriate on the claims under state law, asserted by virtue of 11 U.S.C. § 544(b). Interest on the federal claims should be based on the applicable treasury bill rate. Interest accrues only on the outstanding principal of the judgment, as reduced by settlement payments from other defendants.

## CONCLUSION

The Trustee is entitled to a judgment against BanCal in the sum of $1.5 million plus interest thereon from the date of the transfer at the rates specified above. Counsel for the Trustee is directed to prepare and submit a proposed form of judgment in accordance with this decision.

9. *See In re Nordic Village,* 915 F.2d at 1055, n. 3 (6th Cir.1990). In *Nordic Village,* the Internal Revenue Service received a cashier's check with the name of an entity other than the taxpayer on the remiter. The name was crossed out but still legible. The Court held that the Service had actual notice that the remitter of a cashier's check was some entity other than the taxpayer.