**In re HOOKER INVESTMENTS, INC., L.J. Hooker Corporation, Inc., et al., Debtors.**

**HOOKER ATLANTA (7) CORPORATION, Plaintiff,**

**v.**

**David E. HOCKER and CB Commercial Real Estate Group, Inc., Defendants.**

**Bankruptcy Nos. 89 B 11986, 89 B 12000, 89 B 12199, 89 B 12389, 89 B 12696, 89 B 12741, 89 B 13337, 89 B 13340, 90 B 10058, 89 B 10374–90 B 10395, 90 B 10675, 90 B 10733, 90 B 11879, 90 B 11869, 90 B 12284, 90 B 12841, 90 B 12852 (TLB).**

**Adv. No. 91–6070A.**

United States Bankruptcy Court, S.D. New York.

June 22, 1993.

As Amended July 15, 1993.

---

See also 145 B.R. 138.

option contract for real property, and CB Commercial Real Estate Group, Inc. ("Coldwell"), to whom, at the behest of Hocker, a broker's commission had been paid out of an escrow account funded by Hooker. Hooker seeks to avoid as fraudulent the sale of the option contract and to recover the monies paid for that contract as well as the commission paid to Coldwell. Coldwell has moved for summary judgment dismissing the claims asserted against it in this adversary proceeding.

## I.

On August 9, 1989, the first of many entities related to L.J. Hooker Corporation, Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On that day and over the next thirteen months, scores of affiliates, including this debtor, followed suit. Collectively I will refer to the debtors as the Hooker Group. All of the debtors, save one, filed a joint liquidating plan of reorganization, which I confirmed. (The lone debtor also filed a liquidating plan of reorganization which was confirmed.) This adversary proceeding centers on one of those affiliates in the Hooker Group, specifically, Hooker.

In early 1987, Hocker was granted an option from Edgar Hall Hand, Jr. to purchase a sizeable parcel of land in North Carolina. Several months later, Hocker decided to sell his option. To this end, he engaged Coldwell to find a buyer. The commission to which the parties agreed was five per cent of the purchase price. Coldwell soon located a buyer, Hooker.

Hocker and Hooker signed a letter of intent which, so far as pertinent, provided that (i) Hooker would purchase the option for a price later calculated to be $7,001,505; (ii) Hooker would deposit $500,000 into escrow; and (iii) upon consummation of the transaction, Hocker alone would be legally obligated to pay Coldwell its commission. *See* CB's Local Rule 13(h) Statement, Ex. B at ¶ 11.

Soon after, Hocker, Hooker, Coldwell and Lawyer's Title of North Carolina, Inc. ("Lawyer's Title"), the chosen escrow agent, entered into an assignment agree-

Kaye, Scholer, Fierman, Hays & Handler by Lester M. Kirshenbaum, New York City, for CB Commercial Real Estate Group, Inc.

Proskauer Rose Goetz & Mendelsohn by Steven E. Obus, New York City, for Hooker Atlanta (7) Corp.

## DECISION ON MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Bankruptcy Judge.

Prior to confirmation of its liquidating plan of reorganization, Hooker Atlanta (7) Corporation ("Hooker") sued one David E. Hocker, from whom it had purchased an

ment formalizing the letter of intent. This assignment agreement was consistent with the letter of intent. It also provided that on the closing date, Lawyer's Title would transfer the $500,000 deposit to Hocker and credit Hooker this amount against the purchase price. Until closing, however, Lawyer's Title was to hold the $500,000 in an interest-bearing escrow account and turn it over to Hocker only in accordance with the terms of the assignment agreement, or, in the event of a dispute, in accordance with a final adjudication or written agreement between the parties. The assignment agreement reiterated that Hocker alone would be responsible for paying Coldwell its $350,075 brokerage commission (5% of the $7,001,505 purchase price). Two days after the parties executed the assignment agreement, Hooker transferred the $500,000 deposit to Lawyer's Title. (No separate escrow agreement was executed. The relevant provisions were all contained in the assignment agreement.)

Some months later, Hocker and Hooker modified the assignment agreement with respect to the disposition of the funds in the escrow account. Rather than having Lawyer's Title transfer the $500,000 deposit to Hocker and crediting Hooker that amount against the purchase price, the parties [1] directed Lawyer's Title to transfer $350,075 of the deposit directly to Coldwell in full satisfaction of Hocker's obligation to Coldwell and to remit the remainder to Hooker. Hooker would then pay Hocker the full purchase price less the $350,075 already paid to Coldwell on behalf of Hocker. *See* CB's Local Rule 13(h) Statement Exhibit E; Counter–Statement of Facts Exhibit B.

At the closing, acting on the parties' written instructions, Lawyer's Title transferred $350,075 to Coldwell in satisfaction

of Hocker's obligation for the brokerage commission. After deducting its $100 escrow fee, Lawyer's Title then wired the remaining $169,642.24 deposit to Hooker which, in turn, wired $6,628,366.78 to Hocker.

After it had filed its chapter 11 petition, Hooker commenced this adversary proceeding against Hocker and Coldwell, seeking to avoid the sale and recover both the $6,628,366.78 payment to Hocker and the $350,075 payment to Coldwell as fraudulent conveyances for less than reasonably equivalent value, pursuant to sections 544 and 548 of the Bankruptcy Code.

Coldwell has countered with this summary judgment motion. Coldwell claims the $350,075 broker's fee it was paid is not a voidable transfer under the Code, since, as a subsequent, good-faith transferee for value, Coldwell is protected by section 550(b) of the Code. Hooker suggests otherwise, arguing that Coldwell was the initial transferee of these funds pursuant to section 550(a) of the Code and therefore the fee it received is within the ambit of the Code's fraudulent conveyance recovery provisions. Thus, the narrow issue, as the parties frame it, is whether Coldwell may avail itself of the subsequent, good faith transferee provisions of section 550(b) of the Code, assuming, without deciding, that Hooker can establish a *prima facie* case of invalidity of the transfers under North Carolina [2] or federal bankruptcy law. As I will discuss below, however, there is a predicate issue, whether the transfer to Coldwell was a transfer of Hooker's property.

## II.

 Section 544 of the Bankruptcy Code permits the debtor-in-possession *qua* trustee to exercise whatever rights of avoidance any creditor holding an unsecured allowable claim could have exercised

---

**1.** There is an immaterial dispute regarding whether Hocker unilaterally changed the instructions given to Lawyer's Title or whether Hocker did so in conjunction with Hooker. What is important is that *Hooker* could not, and did not, unilaterally alter the escrow agent's instructions, which instructions could only be modified with the assent of Hocker.

**2.** Paragraphs 2 and 17 of the assignment agreement contained the provisions governing the escrowed deposit. Paragraph 18 provided that the assignment agreement would be interpreted under the law of North Carolina. And, of course, the property is located in North Carolina. Thus, North Carolina law provides the starting point for this discussion.

on his own behalf under applicable non-bankruptcy law. 4 L. King, *Collier on Bankruptcy* ¶ 544.01 at 544–3 (15th ed. 1992). In this case, reference must be made to North Carolina General Statute section 39–15, which governs fraudulent conveyances.[3] *Havee v. Belk*, 775 F.2d 1209, 1219 (4th Cir.1985). Section 39–15 of that statute is applicable only to conveyances made by the debtor himself. *Havee*, 775 F.2d at 1219; *U.S. v. Haddock*, 144 F.Supp. 720 (E.D.N.C.1956). In a similar vein, section 548 of the Bankruptcy Code grants a trustee the power to avoid certain transfers of the debtor's interest in property which were made within one year of the bankruptcy filing. *In re Marquis Products, Inc.*, 150 B.R. 487, 490 (Bankr.D.Me.1993).

■ The particular theory under which a transfer has been avoided is, for all intents and purposes, irrelevant to the liability of the transferee from whom the trustee seeks to recover the property. 4 L. King, *Collier on Bankruptcy* ¶ 550.01 at 550–3. Section 550 of the Code enumerates those entities from whom recovery can be had. Section 550(a) specifies that the trustee may recover a fraudulent transfer of the debtor's property from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made, or (2) any immediate or mediate transferee of such initial transferee. *Security First National Bank v. Brunson (Matter of Cou-*

*tee* ), 984 F.2d 138, 140 (5th Cir.1993); 11 U.S.C. § 550(a).

■ Section 550(a), however, is tempered by Section 550(b), which places limits on the trustee's ability to recover from subsequent transferees under subsection 550(a)(2). A trustee may not recover an avoidable transfer from a transferee, other than the initial one, if that transferee takes for value, in good faith, and without knowledge of the voidability of the transfer sought to be avoided. *Coutee*, 984 F.2d at 140 n. 2; 11 U.S.C. § 550(b)(1). The party seeking recourse to section 550(b) has the burden of proof on these issues. *In re Nordic Village, Inc.*, 915 F.2d 1049, 1055 (6th Cir.1990), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1021 (Bankr.N.D.Cal.1993).

■ Whereas the initial transferee is usually the party who receives possession of the property directly from the debtor, not all entities who receive funds directly from debtors are considered initial transferees. Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees for purposes of section 550 of the Code. 4 L. King, *Collier on Bankruptcy* ¶ 550.01 at 550–3. Thus, to determine whether the trustee may recover a conveyance, the court must discern whether the entity from

**3.** Under G.S. § 39–15, a claim seeking to set aside a conveyance as fraudulent can be established in accordance with the following principles:

(1) If the conveyance is voluntary, and the grantor retains property fully sufficient and available to pay his debts then existing, and there is no actual intent to defraud, the conveyance is valid.

(2) If the conveyance is voluntary, and the grantor does not retain property fully sufficient and available to pay his debts then existing, it is invalid as to creditors; but it cannot be impeached by subsequent creditors without proof of the existence of a debt at the time of its execution which is unpaid, and when this is established and the conveyance avoided, subsequent creditors are let in and the property is subjected to payment of creditors generally.

(3) If the conveyance is voluntary and made with the actual intent upon the part of the grantor to defraud creditors, it is void, although

this fraudulent intent is not participated in by the grantee, and although property sufficient and available to pay existing debts is retained.

(4) If the conveyance is upon a valuable consideration and made with the actual intent to defraud creditors upon the part of the grantor alone, not participated in by the grantee and of which intent he had no notice, it is valid.

(5) If the conveyance is upon a valuable consideration, but made with the actual intent to defraud creditors on the part of the grantor, participated in by the grantee or of which he has notice, it is void.
*Aman v. Walker*, 165 N.C. 224, 81 S.E. 162 (1914). A conveyance is deemed to be "voluntary" when the purchaser does not pay a reasonably fair price such as would indicate unfair dealing and be suggestive of fraud, in other words, a conveyance made without valuable consideration. *North Carolina National Bank v. Evans*, 296 N.C. 374, 250 S.E.2d 231 (1979).

whom recovery is sought is the conduit, initial transferee or subsequent, good faith transferee for value without knowledge of the voidability of the transfer. The distinctions are crucial to recovery, since the trustee cannot recover from either the conduit or the subsequent, good faith transferee for value. *Coutee,* 984 F.2d at 140; *In re Bullion Reserve of North America,* 922 F.2d 544, 547 (9th Cir.1991); *In re Fabric Buys of Jericho, Inc.,* 33 B.R. 334, 336 (Bankr.S.D.N.Y.1983).

▮▮ The Bankruptcy Code does not define "initial transferee." 4 L. King, *Collier on Bankruptcy* ¶ 550.01 at 550–3. Nor has the Second Circuit Court of Appeals articulated a definition for "initial transferee". Other circuit courts that have, however, employ a "dominion and control" test in determining whether a party is considered an initial transferee. Under this test, which is derived from the seminal decision in *Carson v. Federal Reserve Bank of New York,* 254 N.Y. 218, 172 N.E. 475 (1930), a party that receives a transfer from the debtor will not be considered the initial transferee of those funds unless that party legally exercises dominion and control over the transferred funds. Said differently, the initial transferee is one who is legally able to use the money for his own purposes. *Coutee,* 984 F.2d at 141; *In re Baker & Getty Financial Services, Inc.,* 974 F.2d 712, 722 (6th Cir.1992); *Lippi v. City Bank,* 955 F.2d 599, 611 (9th Cir.1992); *Bullion Reserve,* 922 F.2d at 544; *In re Columbia Data Products,* 892 F.2d 26, 28 (4th Cir.1989); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199–1200 (11th Cir. 1988); *In re Harbour,* 845 F.2d 1254, 1256–58 (4th Cir.1988); *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 893–95 (7th Cir.1988); *see also Richmond Produce,* 151 B.R. at 1021.

In *Bonded,* for example, the Seventh Circuit held that dominion over funds meant the right to put the money to one's own use. 838 F.2d at 893. As Judge Easterbrook noted there, an entity does not have legal dominion over the money until it is free to invest that money in "lottery tickets or uranium stocks," if it wishes. *Bonded,* 838 F.2d at 894. In that case, the intermediary party was not the initial transferee because it obtained funds only for the purpose of fulfilling an instruction to make the funds available to someone else. *Id.* at 893.

Remember that when I began this discussion of the law of fraudulent conveyances, I noted that the property to be recovered must have been the debtor's. And that is where my analysis of this dispute properly begins. Stated more precisely, I must decide whether Hooker's deposit of $500,000 into the Lawyer's Title escrow account divested Hooker of control over those funds such that the subsequent transfer to Coldwell when the conditions to the escrow were fulfilled could not be considered a transfer of the debtor's interest in property.

▮▮ The nature and extent of the debtor's interest in property are to be determined by reference to applicable non-bankruptcy, usually state, law. *In re Prudential Lines, Inc.,* 928 F.2d 565, 569 (2d Cir.), *cert. denied sub. nom.,* —— U.S. ——, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); *see also Nobelman v. Am. Savings Bank (In re Nobelman),* —— U.S. ——, ——, 113 S.Ct. 2106, 2109–10, 124 L.Ed.2d 228 (1993); *Butner v. United States,* 440 U.S. 48, 51–54, 99 S.Ct. 914, 916–18, 59 L.Ed.2d 136 (1979). Under section 541 of the Bankruptcy Code, property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. Despite the broad sweep of section 541, the Supreme Court has noted that not all property in which the debtor holds an interest ought be included. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). Specifically, the Court in *Whiting Pools* noted that Congress, in enacting the Code, "intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title." 462 U.S. at 204, n. 8, 103 S.Ct. at 2313, n. 8; *accord Official Committee of Unsecured Creditors of Operation Open City, Inc. v. New York State Department*

*of State (In re Operation Open City, Inc.)*, 148 B.R. 184, 192 (Bankr.S.D.N.Y.1992). Prepetition deposits by the debtor of money or a deed into an escrow account require the same type of query.

▇▇▇▇ In most jurisdictions, such as New York, legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement. *Hassett v. Blue Cross and Blue Shield (Matter of O.P.M. Leasing Services, Inc.)*, 46 B.R. 661, 667 (Bankr. S.D.N.Y.1985). However, the deposit of property placed in escrow

> creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, although pending full performance of the conditions, the legal title remains in the grantor, and is subject to ... the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee.

28 Am.Jur.2d, *Escrow* § 10 (1966); *accord In re One Bancorp Securities Litigation*, 151 B.R. 1, 2 (D.Me.1993). The grantee's equity just described may not be diminished or eradicated by the grantor because a valid escrow requires an irrevocable delivery of property. *Intercontinental Publications, Inc. v. Perry (In re Intercontinental Publications, Inc.)*, 131 B.R. 544, 548 (Bankr.D.Conn.1991). Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, while the property is in the hands of the escrow agent it must be beyond the possession and control of the grantor. If the grantor reserves the right to revoke the agreement, there is no escrow. *O.P.M.*, 46 B.R. at 667; 28 Am.Jur. 2d, *Escrow* § 8, at 13. Here, there can be no doubt and the parties do not dispute

that there was created a valid escrow which Hooker had no right to revoke.[4]

▇▇▇▇ Bearing in mind these principles, I now turn to a discussion of what constitutes the transfer for avoidance purposes. With respect to a deposit by a debtor into escrow, the courts have uniformly held in the context of a preference action that it is the debtor's deposit of funds into escrow and not the subsequent release of the funds that is the controlling transfer. *Carlson v. Farmers Home Administration (In re Newcomb)*, 744 F.2d 621, 627 (8th Cir.1984) (Missouri law); *Shron v. M & G Promo Service, Ltd. (In re Anthony Sicari, Inc.)*, 144 B.R. 656, 661 (Bankr.S.D.N.Y.1992), *aff'd*, 151 B.R. 60 (S.D.N.Y.1993); *Pan American World Airways, Inc. v. Care Travel Co., Ltd. (In re Pan Am Corp.)*, 138 B.R. 382, 388 (Bankr.S.D.N.Y.1992); *Cedar Rapids Meats Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 569–70 (Bankr. N.D.Iowa 1990); *Sapir v. Eli Haddad Corp.) (In re Coco)*, 67 B.R. 365, 369 (Bankr.S.D.N.Y.1986); *O.P.M.*, 46 B.R. at 668. Neither the date the funds are released to the grantee nor the date the funds revert back to the grantor for failure of conditions precedent is relevant. *Sicari*, 144 B.R. at 661. This is so because upon deposit the debtor reserves only a contingent interest to those escrowed funds; a subsequent release of the monies does not deprive the estate of anything of value. *O.P.M.*, 46 B.R. at 668, *citing In re Newcomb*, 744 F.2d at 627. And as I noted in *Coco*, although a subsequent release of those funds might well constitute a transfer under the broad definition set out in section 101(58)[54], it is not the type of transfer that can be avoided, for to be avoidable, a transfer must deprive the debtor's estate of something of value which could be used to satisfy the claims of creditors. *Coco*, 67 B.R. at 369, citing *Newcomb*, 744 F.2d at 626. This analysis may

---

**4.** Technically, the assignment agreement provided that Hooker could elect to terminate the contract and recover its deposit (a) for any reason during a thirty day inspection period, (b) if Hooker discovered an uncured title or survey defect either during or after that inspection pe-

riod, (c) or if Hooker defaulted at any time prior to the closing by breaching a warranty, failing to comply with a condition, or failing to perform an obligation required under the agreement. However, none of those contingencies arose.

be imported to the fraudulent transfer arena since both types of action are designed to avoid transfers of the debtor's property.

■ Even where an avoidance action is not the basis for suit but, instead, the debtor is attempting to recover as property of the estate down payments on a contract which did not close, it has been held that funds placed in escrow by the debtor and released prepetition from escrow are not recoverable by the debtor. This result was premised upon the debtor's having voluntarily relinquished all interest in the property both legal and equitable upon the release of the funds from escrow. *100 Lindbergh Boulevard Corp. v. Gurnett Rock, Inc. (In re 100 Lindbergh Boulevard Corp.)*, 128 B.R. 53, 57 (Bankr.E.D.N.Y. 1991).

I am mindful that the foregoing analysis is derived from the discussion in American Jurisprudence 2d, *Escrow*, as interpreted by a variety of courts other than those of North Carolina. The simple reason is because the North Carolina courts have not written on the subject of escrow. Nonetheless, the courts of that state have readily adopted the common law as expressed in American Jurisprudence 2d in numerous other areas. *See, e.g., Statesville Stained Glass, Inc. v. T.E. Lane Construction & Supply Co., Inc.*, 110 N.C.App. 592, 430 S.E.2d 437 (1993) (applying Am.Jur.2d, *Corporations*); *State v. Kennedy*, 110 N.C.App. 302, 429 S.E.2d 449 (1993) (applying Am.Jur.2d, *Judges*); *Guyther v. Nationwide Mutual Fire Insurance Co.*, 109 N.C.App. 506, 428 S.E.2d 238 (1993) (applying Am.Jur.2d, *Expert & Opinion Evidence*); *State v. Suites*, 109 N.C.App. 373, 427 S.E.2d 318 (1993) (applying Am.Jur.2d, *Criminal Law*); *Amerson v. Willis*, 109 N.C.App. 297, 426 S.E.2d 428 (1993) (applying Am.Jur.2d, *Damages*); *Andrews v. Elliot*, 109 N.C.App. 271, 426 S.E.2d 430 (1993) (applying Am.Jur.2d, *Libel & Slander*); *Professional Food Services Management, Inc. v. N.C. Dep't of Administration*, 109 N.C.App. 265, 426 S.E.2d 447 (1993) (applying Am.Jur.2d, *Public Works and Contracts*); *Marantz Piano Co., Inc. v. Kincaid*, 108 N.C.App. 693, 424 S.E.2d 671 (1993) (applying Am.Jur.2d, *Landlord and Tenant*); *Angel v. Truitt*, 108 N.C.App. 679, 424 S.E.2d 660 (1993) (applying Am.Jur.2d, *Mobile Homes*). I see no reason to conclude that they would depart from the common law in this area.

■ Here, when Hooker deposited the $500,000 with Lawyer's Title, that deposit created an irrevocable transfer which left Hooker with only a contingent right to the escrowed funds. Thus, while legal title to those funds remained with Hooker pending full performance of the contract conditions by Hocker, that deposit created in Hocker a concomitant equitable interest. It is this deposit that is the controlling transfer for purposes of fraudulent conveyance recovery of the monies paid to Coldwell[5].

■ On the closing date, Hocker, having satisfied its obligations under the assignment agreement, controlled the disposition of the escrowed deposit. While Lawyer's Title retained actual possession of the funds, the transfer of rights to Hocker made Lawyer's Title Hocker's agent with respect to the apportionment and payment of the escrowed deposit. A party may be deemed an initial transferee of funds, notwithstanding that he never actually took physical possession of those funds, if those funds were transferred to that party's agent. *In re Medical Cost Management, Inc.*, 115 B.R. 406 (Bankr. D.Conn.1990); *In re Black & Geddes*, 59 B.R. 873, 874 (Bankr.S.D.N.Y.1986). Although Hocker did not obtain physical possession of those funds, he could have disbursed them as he wished. Hocker chose to simplify the number of steps in this transaction by having Lawyer's Title pay Coldwell directly out of the escrowed deposit. Were it not for this simplification, Hocker would have received the deposit from Lawyer's Title, would have received the remainder of the purchase price from

---

**5.** Of course, the payment of the balance of the purchase price constitutes a second, potentially recoverable transfer.

Hooker and would have satisfied his obligation to pay Coldwell. The actual disposition of the escrowed funds does not alter the fact that once the closing occurred and the conditions of the escrow were met, both legal and equitable title to the funds on deposit was vested in Hocker. Hocker was free to do with the funds whatever he saw fit, which, in this case, was to pay a portion of them to Coldwell and the balance of them to Hooker.[6] Thus, the transfer to Coldwell was not a transfer by Hooker, but a transfer by Hocker, albeit through the intermediary of Lawyer's Title. As a result, Coldwell cannot have been an initial transferee of Hooker's property. If Coldwell can be considered a transferee of Hooker's property at all, it is a subsequent transferee (from Hocker).

Since subsequent to the briefing of this motion Hooker conceded that Coldwell took for value and without knowledge of the alleged voidability of the transfer to Hocker, no recovery can be had from Coldwell by virtue of section 550(b).

### III.

The facts are wholly undisputed and lead inexorably to the conclusion that Coldwell is not an initial transferee of Hooker's property. Nor does any party contend that Coldwell did not take for value (its brokerage services) or that it had knowledge of the alleged voidability of the transfer. Consequently, Coldwell's motion for summary judgment may properly be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

SETTLE ORDER consistent with this decision.

---

6. Note that the parties did not abandon the escrow even though the balance deposited after payment of Coldwell was returned to Hooker. This was accomplished only through the agreement and instructions of Hocker and occurred only after the conditions to the escrow had been fulfilled, at closing.